[Civ. No. 18569. Third Dist. Aug. 20, 1980.]

In re JEREMY C., A Person Coming Under the Juvenile Court Law.
MAURICE E. O'NEAL, as Probation Officer, etc.,
Plaintiff and Respondent, v.
JEREMY C., Defendant and Appellant.

**COUNSEL**

Joan G. Poulos, under appointment by the Court of Appeal, for Defendant and Appellant.

N. Edward Denton, District Attorney, and David L. Cross, Deputy District Attorney, for Plaintiff and Respondent.

**OPINION**

**CARR, J.**—On January 12, 1979, Jeremy, approximately four years of age, was declared a dependent child of the Mono County Juvenile Court pursuant to the provisions of Welfare and Institutions Code section 300, subdivision (d).[1] The child was removed from the custody of his mother, Janet, the custodial parent, and placed with the probation officer of Mono County for foster placement in the home of Tim and Ellen Devore.

---

[1] All statutory references are to sections of the Welfare and Institutions Code unless otherwise indicated.

On February 15, 1979, a further hearing on a motion by Janet to modify the previous order of the juvenile court was held. The basis of her motion was that no disposition hearing as mandated by section 358 had been held. She requested custody be returned to her.[2] These proceedings also encompassed disposition. The report of the probation officer, filed February 14, 1979, was considered, testimony was elicited from the foster mother, Mrs. Devore; Jeremy was continued in foster placement. March 12, 1979, was set for further hearing on what the trial court designated as a final disposition hearing and a further hearing on the motion to modify.

On March 12, 1979, the finding of dependent child status and the order removing Jeremy from his mother's custody were both reaffirmed by the trial court; Jeremy was again placed in the custody of the probation officer for foster placement in the Devore home. Jeremy appeals from those orders.[3]

Appellant asserts essentially three errors:

(1) The trial court failed to obtain a social study which included a recommended plan for reuniting the minor with his mother prior to removing the child from the mother's home;

(2) The trial court improperly shifted the burden of proof on the issue of removal to appellant and his mother at the dispositional hearing; and

(3) Removal from the home was not in the best interests of the child, and, inferentially, was an abuse of discretion by the trial court.

---

[2]The clerk's transcript includes a motion to modify which was set for hearing on February 15, 1979, and the minute order designated that hearing as a motion for modification. However, the clerk's transcript blurs the clarity of these documents, and it is uncertain whether such hearing on February 15, 1979, was on the motion to modify, was a disposition hearing, or a combination thereof.

[3]Subsequent to that hearing, Janet petitioned the court for appointment of the public defender for herself. Her financial declaration in support thereof prima facie qualifies her for such services. However, there is no disposition of that request in the record before us nor was there an appeal filed by Janet. Jeremy's appeal was filed by Janet on his behalf and purports to appeal only from "the orders of the Juvenile Court sustaining the petition of January 4, 1979." However, the parties have considered the appeal as one from both the jurisdictional and dispositional hearings; we do likewise.

I

Section 356 empowers the trial court to continue a disposition hearing, after sustaining a section 300 petition, to receive the social study of the probation officer. Section 280 requires the probation officer to prepare a social study for every dispositional hearing. Rule 1376, subdivision (b), California Rules of Court, requires the probation officer to include in the social study a recommended plan for reuniting the minor with the family if the recommendation is to remove the child from the home.[4] Section 358 requires the court to receive the social study into evidence and to state in any judgment, order or disposition that the court has read and considered the social study. The same requirements are reiterated in rule 1376, subdivision (d), California Rules of Court with an additional provision that the court, where appropriate, shall state in such judgment or order that the plan for family unification has been discussed with the family.

The failure to have such a plan for reunification before the court, together with other evidentiary deficiencies, was the basis of reversal of an order removing the child from her parents and placing her in a foster home in *In re Jeannette S.* (1979) 94 Cal.App.3d 52 [156 Cal.Rptr. 262], a "filthy home" case within the purview of section 300, subdivisions (a) and (b). ■ The question here is whether such a social study is mandated for neglect and abuse cases under section 300 subdivision (d). We determine it is.

No formal plan for reunification of the minor with his mother was included in either of the two reports filed by the probation officer. At the February 15, 1979, hearing, counsel for Janet objected that the February 14th report did not contain a proper social study with a recommended plan of reunification but was merely a summary of the child's activities in the foster home. The report incorporated a copy of the foster mother's "log" describing her difficulties in securing clothing for Jeremy from Janet and an account of the probation officer's belated and meager attempts to contact Janet for an interview.[5]

[4]Rule 1376, subdivision (b) provides in part: "Prior to every disposition hearing, the probation officer...*shall* prepare a social study of the minor.... If a recommendation is made to remove the minor from the home, the probation officer...*shall* also include in the social study a recommended plan for reuniting the minor with the family." (Italics added.)

[5]The probation officer's first attempt to contact Janet was February 9, six days before the February 15th hearing; she was not at home. He tried again on February 11th;

The trial court overruled the objection, attributing the lack of a plan to Janet's refusal to meet with the probation officer on the one night he had reached her two days before the scheduled hearing. The trial court precluded Janet's counsel from any objections to the probation report and limited her cross-examination of the probation officer to inquiries concerning the source of his information.[6]

The probation officer's report filed March 12, 1979, contained no plan for reunification. The reason given was it would be impossible to formulate such a plan because of pending criminal charges against Janet and her live-in boy friend, Doug, arising from alleged physical abuse of Jeremy.[7]

---

she was not at home. On February 13th at 4:30 p.m., he reached her at work and requested an interview that evening; she said she couldn't attend because she didn't know where she would be. (Actually she had been planning to clean a condominium.) She called her attorney who immediately called the probation officer to arrange for the interview, but the probation officer could not be reached. There is no evidence that he ever contacted Janet's attorney to arrange an interview, which is an acceptable practice employed by many probation officers, or that he ever sent a letter to Janet, which is an acceptable means of communication employed by many persons, including probation officers.

[6]The following, somewhat astonishing dialogue, occurred between Janet's counsel and the court:

"THE COURT: He asked her for an appointment that night, she said no, but she didn't know where she would be.

"MISS MEDINA [Janet's counsel]: That's true, Your Honor.

"THE COURT: Well, if it's true, then I think it's some evidence of unfitness. You mean a mother doesn't know where she is going to be?

"MISS MEDINA: No, she knew where she was going to be.

"THE COURT: Of course she did; of course she did. That's not the first—here in this Court I have before me that when she was asked to bring the child's clothes, she brought them in a filthy condition, that is the underwear had fecal matter on it.

"MISS MEDINA: I would object to that comment, Your Honor.

"THE COURT: I don't care whether you object to it or not. It's in this report and I am considering it.

"MISS MEDINA: I—.

"THE COURT: You don't object to a report that's filed by this probation officer. You have your rights to cross-examine, but don't you object to this report. He is trying to file a report with this Court in accordance with the law. Now, you don't have to concur with it. I will hear no further objections of this kind, do you understand, Miss Medina?

"MISS MEDINA: Yes, Your Honor. . . ."

[7]This court on its own motion ordered augmentation of the record to include any proceedings subsequent to the March 12, 1979, hearing and the record of criminal proceedings instituted against Janet and Doug. This augmentation was done for two reasons: (1) the trial court had ordered a further hearing for July 12, 1979, to determine if the child should be returned to the custody of the mother. If the child had been returned, this appeal would be largely moot; and (2) the sole basis of the probation officer's failure to include a reunification plan in his March 12, 1979, report was the alleged pendency of criminal proceedings against Janet and Doug with the resulting in-

Respondent asserts the mandatory requirement for a social study, including a plan for reunification, was satisfied in that (1) Janet refused to cooperate in providing information for such a plan, (2) the court had no duty to instruct the probation officer to prepare such a plan, and (3) oral testimony supplemented the probation report, supplying the requisite plan information.

These assertions are unsupported by the record. The attempts by the probation officer to contact Janet prior to the February 15th hearing were cursory at best. An interview was conducted with Janet prior to the March 12th hearing, but no plan was formulated allegedly because of the pendency of the criminal charges. But Janet had testified at the February 15th hearing and had been cross-examined with some vigor by both the prosecutor and the trial court. There was no indication that she was asserting any privilege or that she refused to discuss a reunification plan with the probation officer. Irrespective of the pendency of criminal charges, if any there were, the probation officer had an affirmative duty to suggest a plan for reunifying the family, and his failure to do so is reversible error unless a plan can be contrived from the oral testimony received at the hearings.

The contention that the court had no duty to instruct the probation officer to formulate a plan merits little consideration. The trial court is in charge of the proceedings; it is that court's duty to see that pertinent laws and rules are followed. Moreover, the trial court herein had no misconceptions of his authority in relation to the probation officer when he stated: "I can't listen to what Mr. O'Neal [probation officer], whom I know very well, have a high opinion—he wouldn't serve—he serves at my pleasure at Mono County, and if I thought he was a liar or a fool or incompetent, he wouldn't be a probation officer. I selected this man to be our probation officer, and he's proved, generally—oh, once in a while we've had a little session with him, and sometimes I don't follow his recommendations...."

We do not dispute the trial court's power to take oral testimony to supplement the probation report on a reunification plan. However, the testimony elicited herein failed any such formulation.

---

ability of the probation officer to assess the home situation and the origin of any physical abuse to the minor. We note the augmented record contains no evidence that any criminal charges were filed or prosecuted against either Janet or Doug.

Respondent contends Janet failed to produce any evidence on her motion to modify which would warrant submitting such a plan.

Respondent misconstrues the statutory duty. It is the duty of the probation officer to present a plan, not the parent, who is in imminent peril of losing child custody. Moreover, at the March 12th hearing, the trial court refused to permit Janet to put on any evidence. Janet's counsel attempted to call witnesses to testify to the relationship between Jeremy and his mother prior to Jeremy's foster home placement. The court stated that such evidence "would be invasive of the province of the court ...what I call evidence by the bail" [*sic*]. Further, that "I can give it very little, if any, effect...I would cross-examine them myself and I think I'll dispose of them rather quickly...." One witness, a next door neighbor, called by Janet, testified that she and Janet each babysat with the other's children from about November 1978 until January 1979; that she had never seen Jeremy abused and did not feel that he would be in physical danger from his mother if returned to her. Under court interrogation, the witness related Janet had told her Jeremy was taken from her because of child abuse. She stated she would continue having Janet babysit for her own children even though the court told her that child abuse had been established in his court beyond a reasonable doubt; whereupon the court dismissed her from the witness stand with an admonition "I wouldn't believe you under oath." The court refused to hear further similar testimony from other witnesses.

The only other testimony at the March 12th hearing was from the probation officer and the foster parents. This evidence was that Janet was employed and living by herself (Doug having moved out); that she had acquired a driver's license; that she had regular visitation with Jeremy, brought clean clothes for him and had established a good relationship with him; that he was happy to be with her and cried when she left.

We perceive that the trial court would not have considered a reunification plan at either the February 15th or March 12th hearing if one had been submitted to it. Janet had no credibility in the court. When she attempted to advise the judge that Jeremy had lived with his grandmother (whose residence was in Washington) the court admonished her: "Just a moment, please. If you have anything to offer you are going to be sworn. You have no credibility with this court. When you are sworn, let alone volunteer statements [Janet], I don't believe a word you have

testified to in this courtroom." Later in the proceedings the court advised: "I don't believe her one iota and I didn't..."

At the February 15th hearing the court stated: "All right. I am going to set a hearing date. When do you want to come into court for a final disposition of this case? [¶] Mr. O'Neal [probation officer], you can file a report recommending a plan for the reuniting of this child and the mother but it's all going to be a matter of semantics. If you recommended that that plan be carried into execution at the present time I'm going to pay no attention to it under the evidence I have heard here...."

The probation officer made no effort to discuss with Janet what she must do to regain custody of Jeremy. He failed to perceive that he had any duty in this regard.[8]

The only mention of any sort of plan presented at the disposition hearing were statements by the court to Janet's father who had come from Saudi Arabia, where he was employed, to be present at the hearing, and to Janet. To the father the court stated: "I probably will, as a plan, when I have more time and when there is showing that the criminal charges are no longer pending, and if there is a showing that they [Janet and Doug] are no longer living together, and there is possibly some showing just who did what, I probably will have Jeremy come to his mother to be with his mother, and there is no promises but this is my plan. When I feel it's safe to be with his mother in a couple of days, a week, like on Saturdays or Sundays or something...." We dismiss these as mere musings and not the specific recommendations of improvements within the home, a successful completion of therapy programs or other conditions contemplated by rule 1376. The statements by the court to Janet were at best admonitions that if Janet demonstrated that she was an upright, moral citizen who visited Jeremy with loving regularity,[9] the court might consider at the July 12th review hearing whether she should have further visitation with Jeremy.

The Advisory Committee comment on the reunification plan provision of rule 1376 states one purpose of the plan is to put the family on

---

[8]When asked by the court if he (the probation officer) had told Janet what she should do before the child would be returned to her, his emphatic response was: "Absolutely not. That isn't my decision...."

[9]The evidence was that the foster parents limited her visitation to once a week.

notice as to what must be accomplished to reunify the family. (Deerings Ann. Rules of Court, (1980 Cum. Supp.) p. 180.)

A vital aspect of the rule is its recognition that preference should be accorded parental custody unless clear and convincing evidence of detriment to the child is presented. (*In re B. G.* (1974) 11 Cal.3d 679 [114 Cal.Rptr. 444, 523 P.2d 244]; *In re Robert P.* (1976) 61 Cal.App.3d 310 [132 Cal.Rptr. 5].) As observed by the United States Supreme Court: "It is cardinal with us that the custody, care and nurture of the child reside first in the parents whose...function and freedom include preparation for obligations the state can neither supply nor hinder." (*Prince* v. *Massachusetts* (1944) 321 U.S. 158, 166 [88 L.Ed. 645, 652, 64 S.Ct. 438].) We are not persuaded that state intervention and disruption of family ties is appropriate when there is a total absence of meaningful alternatives. Foster home care has proliferated. This does not mean that it is either the recommended or even a desirable disposition. "It is now the prevailing ethic among child care experts that foster care has been overused as a means of protecting children. Although still widely used, foster care is considered generally to be a worse alternative than leaving a child in the home." (Wald, *State Intervention on Behalf of "Neglected" Children* (1976) 28 Stan.L.Rev. 625, at p. 644.)

We conclude it was reversible error for the court to remove Jeremy from his mother's custody without requiring and exploring a plan for reunification of the minor with his mother.

## II

Appellant's contention that the court improperly shifted the burden of proof to the opponents on the issue of removing the minor from the family home is without merit. What was noticed as a modification hearing on February 15, 1979, in reality was a hybrid of both disposition and motion to modify. The court's remarks that the burden was on Janet to show "that she was a safe custodian" were made at such hearing and presumably were applicable to the motion to modify, wherein the burden of proof is on the parent seeking modification of a previous court order. (*In re Francecisco* (1971) 16 Cal.App.3d 310, 314 [94 Cal.Rptr. 186].)

The error in the disposition hearing was in the standard employed by the court in making and affirming the order granting custody of Jeremy to a nonparent. The court repeatedly stated such order was

based on the best interests of the child. This is not the full standard. A specific finding of detriment to the child from parental custody must be established by clear and convincing evidence before the custody may be awarded to a nonparent. (*In re B. G., supra*, 11 Cal.3d 679; *In re Robert P., supra*, 61 Cal.App.3d 310; *In re Christopher B.* (1978) 82 Cal.App.3d 608 [147 Cal.Rptr. 390].[10]

The testimony at the disposition hearing related only to the adjustment of the minor in the foster home. There was no evidence that resumption of custody by the mother at the time in question would be detrimental to the child. The only evidence produced in this respect was positive; further, the court precluded Janet from putting on evidence on this issue.

We hold it was error for the court to foreclose the parties from presenting evidence that the mother's home was at the time of the disposition hearing a nondetrimental environment for Jeremy and to apply only the standard of the best interests of the child in removing him from his mother's custody.

### III

Appellant's final contention is that removal from his mother's home is not in his best interests. We review this is as a contention that the evidence does not support a finding of detriment from an award of custody to his mother. We have already found error in the court's failure to apply the proper standard. The question is whether we remand for a new disposition hearing in conformity with the views expressed herein or whether we reverse the entire proceedings for fatal error. ■ If the finding of dependency is supported by substantial evidence, we are bound by the trial court's determination (*In re Luwanna S.* (1973) 31 Cal.App.3d 112, 114 [107 Cal.Rptr. 62]) in the absence of other reversible error.

The adduced facts demonstrate that in January 1979 Jeremy resided with his mother, aged 23, and separated from her husband, together with her boyfriend, Doug, aged 18, in a duplex in the Mammoth Lakes

---

[10]The court at least by utterance properly applied the clear and convincing burden of proof standard. (Unnecessarily so at the jurisdictional hearing where the finding that a minor is a person within section 300 requires only a preponderance of the evidence.) (*In re Lisa D.* (1978) 81 Cal.App.3d 192 [146 Cal.Rptr. 178]; *In re Christopher B., supra*, 82 Cal.App.3d 608.)

area. Janet worked as a teacher's aide in an elementary school and on a second job at Mammoth Lodge on an on-call basis on weekends. (Commencing in mid-November 1978.) Gail Cummings cared for Jeremy at her house weekdays. When the water pipes at Janet's house were frozen (apparently a common occurrence in this area in the winter), Mrs. Cummings bathed Jeremy. On January 2, 1979, the first time she had seen Jeremy for four days, Mrs. Cummings noted bruises on his face and buttocks while bathing him. She had previously noticed bruises on him on one occasion and was concerned that there had been child abuse. She was also concerned that he appeared hungry when he arrived in the mornings, that his clothes did not fit properly, his socks did not match, and he usually was not wearing underwear, though he wore a hat, gloves and coat over his outer clothing. Mrs. Cummings notified the sheriff's department on January 2d, officers arrived, photographed Jeremy's face, and took him to a doctor for examination. The doctor found mild, as opposed to moderate or severe, bruises, between eight hours and three days old, on Jeremy's face and buttocks. He concluded the bruises on the buttocks were consistent with what would be considered normal punishment, but the facial bruises, containing striping, indicated a hand caused the marks. To him, this was evidence of possible abuse and "real and preventative measures should be taken." By this he meant the matter should be investigated to determine if there had been child abuse and if so, something in the nature of family-type therapy should be instituted. The only indicators of abuse were the facial bruises, though the doctor stated, "But I've been slapped in the face by my father, so I wouldn't say slapping or hitting is necessarily bad; it's certainly an excellent way to get one's attention." Jeremy also had skeletal X-rays and there was no evidence of recent or old fractures, which are frequent indicators of serious abuse.[11] On a scale of 10, if there were in fact child abuse, the doctor would place it on the lower end of the scale in terms of severity. In all other respects, Jeremy was physically normal and healthy. He had previously been brought by his mother to the same doctor for treatment of a cold or flu. The doctor did not specifically recommend the child be removed from his mother, though he acknowledged that this step is occasionally taken, particularly in the more serious cases.

The probation officer removed Jeremy from the babysitter's home and placed him in a foster home. A detention hearing was held January 5, 1979, at which time Jeremy was released to his mother's custody.

[11]Ironically, the only fracture Jeremy has ever sustained was in the foster home, when his arm was broken when he allegedly fell out of bed.

At the jurisdictional hearing on January 12th, a former neighbor in Janet's duplex testified the walls were thin, she often heard sounds of Jeremy crying and of his being spanked. On one occasion she saw Doug hit Jeremy hard on the side of the head. She also observed Jeremy home alone on four occasions and had given him something to eat when he came over and no one appeared to be at his home. She called the sheriff's office in October 1978, because she thought Jeremy was being beaten. The officers declined to respond because she didn't *see* anything happening to the child. She had never seen bruises on Jeremy or Janet striking him.

Janet denied hitting Jeremy in the face or leaving him unattended. She had spanked him on January 1st and observed no bruises on him the next morning. She further testified that Doug had told her that Jeremy had fallen between his bed and the wall on the evening of January 1st and that Jeremy had told her Mrs. Cummings hit him on the head because he wouldn't take a nap. The court labeled her testimony "incredible." Doug did not appear and testify. He was under a court order not to contact Mrs. Cummings as he had called her on the night Jeremy was taken into custody and been verbally abusive.

The court sustained the petition, finding the allegations of neglect and abuse were sustained by clear and convincing evidence and ordered Jeremy placed in the same foster home in which he had been detained prior to the detention hearing.

At the February 15th hearing, the court read the probation officer's report concerning the efforts of Mrs. Devore, the foster mother, to retrieve certain clothes she had purchased for Jeremy.[12] After reading and hearing this testimony, the court concluded that Jeremy was now a battered child. The court's conclusion seemingly was based on the mother's irresponsibility in not returning Jeremy's clothes. The medical evidence does not sustain a finding that Jeremy was a battered child, as that term is generally understood. The district attorney admitted in argument that the physical abuse was not extreme or very serious and the home should be subjected to "possibly some strict supervision." It is unclear from the record, but if the court's basis for removing Jeremy from parental custody was his status as a battered child, this was error and an abuse of discretion.

---

[12]The evidence was that Mrs. Devore had asked Janet for the clothes. Janet told her they were in the trunk of an automobile in another town; that she had some clothes but

■ While this is probably the mildest case of child abuse that will come before this court, it is unnecessary for us to determine if the conclusionary allegations of the petition and purported findings were established by a preponderance of evidence as we find reversible error in the form of the petition. The charging allegations of the petition were so deficient as to violate the notice requirements of due process. Though not distinctly raised as an issue in this appeal, the issue is of sufficient significance that this court should and does address it. The point was preserved in the court below when Janet's counsel objected at the detention hearing to the lack of specific factual allegations in the petition. Section 332, subdivision (f) requires "A concise statement of facts, separately stated, to support the conclusion that the minor upon whose behalf the petition is brought is a person within the definition...of the [section] under which the proceedings are being instituted." The petition simply recited in the words of section 300, subdivision (d) that "his [Jeremy's] home is an unfit place for him by reason of neglect, cruelty, depravity or physical abuse of either of his parents, or of his guardians or other persons in whose custody or care he is."

Notice of the specific facts upon which removal of a child from parental custody is predicated is fundamental to due process. (*In re Gault* (1967) 387 U.S. 1, 30-31 [18 L.Ed.2d 527, 547-548, 87 S.Ct. 1428]; *In re Neal D.* (1972) 23 Cal.App.3d 1045, 1048 [100 Cal.Rptr. 706].) Notice of the specific facts upon which the petition is based is necessary to enable the parties to properly meet the charges. The requirement of specific facts derives from the recognition that "the statutory criterion of improper and ineffective parental care denotes a fairly extreme case. A dominant parental right to custody of the child pervades our law.... Thus before [the law] authorizes the drastic step of judicial intervention, some threshold level of deficiency is demanded. Although a home environment may appear deficient when measured by dominant socioeconomic standards, interposition by the powerful arm of the public authorities may lead to worse alternatives." (*In re Raya* (1967) 255 Cal.App.2d 260, 265 [63 Cal.Rptr. 252].)

A bare recital of the conclusionary words of the statute does not suffice as notice.

---

had no car to get to the laundromat to wash them; finally, Mrs. Devore asked Janet to bring whatever she had and Janet brought a little suitcase containing both clean and dirty clothes, some with fecal matter on them. Mrs. Devore closed the suitcase and put it away without using the clothes.

The judgment is reversed as to both the jurisdictional and dispositional orders. The case is remanded to the trial court to either dismiss the petition or to require the filing of a new amended petition which sets forth specific allegations of alleged neglect and abuse. Pending such further proceedings, if any, Jeremy shall be returned to his mother, Janet.

Puglia, P. J., and Blease, J., concurred.