[No. B021106. Second Dist., Div. Six. July 1, 1987.]

RACHEL HANSEN et al., Plaintiffs and Respondents, v.
DEPARTMENT OF SOCIAL SERVICES et al., Defendants and
Appellants.

[No. B012398. Second Dist., Div. Six. July 1, 1987.]

SALVADOR MONTES et al., Petitioners, v.
THE SUPERIOR COURT OF VENTURA COUNTY, Respondent;
DEPARTMENT OF SOCIAL SERVICES et al., Real Parties in
Interest.

COUNSEL

John K. Van de Kamp, Attorney General, Charlton G. Holland, Assistant Attorney General, Ann S. Pressman, Barbara M. Motz and Richard A.

Spector, Deputy Attorneys General, for Defendants and Appellants and Real Parties in Interest.

Melinda R. Bird, Robert D. Newman, Richard A. Rothschild, Gary L. Blasi, Michael I. Bodaken, Byron J. Gross, Patricia Nagler, Yvonne Mariajimenez, Colleen Fahey Fearn, Katherine E. Meiss, Edward Barnes, Tamara Dahn, Anita Evans, Joel Harter, Thomas Pulliam, Deborah Dorman, Abby Lassen, Kirk Ah Tye, Elizabeth Arnold, Nancy Mintie, Grace Galligher, Robert K. Miller, M. Ilda Pruneda and M. Carmen Ramirez for Plaintiffs and Respondents and Petitioners.

Frances E. Werner and James Carroll as Amici Curiae on behalf of Petitioners.

No appearance for Respondent Court.

---

## OPINION

**ABBE, J.**—We consider in these consolidated cases whether California law requires the California Department of Social Services (hereafter referred to as DSS) to provide assistance to homeless families. We find that DSS regulation which limits "emergency shelter care" to children "who must be immediately removed from [their] homes," to be contrary to the plain meaning of Welfare and Institutions Code, sections 16501, subdivision (c) and 16501.1.[1]

A. *Procedural Background*

1. *Montes* v. *Superior Court*

On September 24, 1984, Salvador Montes and Joseph McCarthy (hereinafter referred to as petitioners) filed a taxpayers' mandamus action in Ventura County seeking to compel DSS and its director to assist homeless aid to families with dependent children (AFDC) families.

On February 1, 1985, petitioners moved for summary adjudication. The motion was denied on March 28, 1985. The trial court ruled that the statutes governing the AFDC program do not compel DSS to extend assistance in finding housing to homeless AFDC recipients. It further determined the Legislature to be the appropriate forum in which to address the issues tendered by petitioners. ■■ ■ ■ The court held that

---

[1] Unless otherwise noted, all further statutory references are to the Welfare and Institutions Code.

We have been called upon to determine which persons are *eligible* to receive "emergency shelter care." The parties have not tendered the issue of defining the *manner* in which "emergency shelter care" is to be provided to eligible persons.

petitioners lacked standing to seek relief, inasmuch as it had not been alleged that any of them were, in fact, homeless.[2]

A petition for a writ of mandate from this court was summarily denied on April 30, 1985. On July 11, 1985, the Supreme Court granted a petition for review and ordered the matter transferred to this court with directions that we issue an alternative writ.

2. *Hansen* v. *Department of Social Services*

Plaintiffs (hereinafter also referred to as petitioners) filed a class action in Los Angeles County on behalf of families who are homeless, or who are imminently threatened with homelessness, to compel DSS to provide emergency shelter or other child welfare services to homeless families.

On May 12, 1986, the trial court decided that petitioners were likely to succeed in ultimately obtaining an injunction, and that a balancing of equities justified the issuance of a preliminary injunction. (Code Civ. Proc., §§ 526, 527.) DSS was prohibited by the injunction from denying the provision of emergency shelter care "so as to exclude homeless children, regardless of whether homeless children remain with their parent(s), guardian(s), or caretaker(s)." DSS has appealed this ruling.[3]

---

[2] The court's determination as to the question of standing was incorrect. Petitioners, as taxpayers, need not be homeless in order to have standing to bring the present action. " ' "[W]here the question is one of public right and the object of the mandamus is to procure the enforcement of a public duty, the relator need not show that he has any legal or special interest in the result, since it is sufficient that he is interested as a citizen in having the laws executed and the duty in question enforced" ' [citation]." (*Green* v. *Obledo* (1981) 29 Cal.3d 126, 144 [172 Cal.Rptr. 206, 624 P.2d 256].)

Moreover, petitioners have standing as taxpayers to obtain a declaratory judgment concerning the nature and extent of DSS's duty to assist homeless AFDC families. (*Van Atta* v. *Scott* (1980) 27 Cal.3d 424, 449-450 [166 Cal.Rptr. 149, 613 P.2d 210].) Declaratory relief may be granted where the complaint states sufficient facts to support such relief, even though the pleader did not seek such relief in his complaint. (Code Civ. Proc., §§ 580, 1060; *Bank of America etc. Assn.* v. *Gillett* (1940) 36 Cal.App.2d 453, 455 [97 P.2d 875]; 5 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 804; see also *Minor* v. *Minor* (1960) 184 Cal.App.2d 118, 127 [7 Cal.Rptr. 455].)

[3] DSS does not seek appellate review of the question of whether the petitioners have made a requisite showing of (1) a balancing of equities favoring the preliminary injunction and (2) the risk of irreparable injury. (See *Continental Baking Co.* v. *Katz* (1968) 68 Cal.2d 512, 527 [67 Cal.Rptr. 761, 439 P.2d 889].) Accordingly, our inquiry will be limited to the question of whether the trial court abused its discretion in finding there to be a strong likelihood of success on the merits of the petitioners' claims. (*Id.* at pp. 527-528.) This determination necessitates an analysis of relevant law. (*City of Torrance* v. *Transitional Living Centers for Los Angeles, Inc.* (1982) 30 Cal.3d 516 [179 Cal.Rptr. 907, 638 P.2d 1304].)

B. *A Brief Overview of the Child Welfare Services Program.*

In 1961, the federal government began providing funds to assist the states in protecting abused and neglected children. (42 U.S.C § 606(a)(1); *Miller* v. *Youakim* (1979) 440 U.S. 125, 126-128 [59 L.Ed.2d 194, 198-199, 99 S.Ct. 957].) In ensuing years, there was a growing concern that the expenditure of these funds was resulting in the warehousing of children in foster homes and in the breakup of families. (*Smith* v. *Organization of Foster Families* (1977) 431 U.S. 816, 824-825 [53 L.Ed.2d 14, 22-23, 97 S.Ct. 2094]; *In re Jeremy C.* (1980) 109 Cal.App.3d 384, 393 [167 Cal.Rptr. 283]; Wald, *State Intervention on Behalf of "Neglected" Children: A Search for Realistic Standards* (1975) 27 Stan.L.Rev. 985, 994-995 (hereinafter referred to as Wald I).)

In an effort to reverse this trend, Public Law No. 96-272 (Adoption Assistance and Child Welfare Act of 1980) amended the Social Security Act. (See 42 U.S.C. §§ 622, 625(a)(1), 671, 672.) Public Law No. 96-272 requires that a participating state provide "child welfare services," with the purpose of fulfilling the following objectives: ". . . (A) protecting and promoting the welfare of all children, including . . . homeless . . . children; (B) preventing or remedying, or assisting in the solution of problems which may result in the neglect, abuse, exploitation, or delinquency of children; (C) preventing the unnecessary separation of children from their families by identifying family problems, assisting families in resolving their problems, and preventing breakup of the family where the prevention of child removal is desirable and possible . . . ." (42 U.S.C. § 625.)[4] Such wording makes evident congressional recognition of the inseverability of child well-being from the preservation of the family unit. It further recognizes that its objectives can best be accomplished by providing, whenever feasible, such child welfare services that further and preserve the integrity of the family and that such services be rendered "to prevent or eliminate the need for removal of the child from his home . . . ." (42 U.S.C. § 671(15)(A); see also 42 U.S.C. § 625(a)(1)(C).)

The Adoption Assistance and Child Welfare Act of 1980 reflects congressional awareness of the special solicitude that the United States Supreme Court has had for the family unit. The Supreme Court has long recognized that the institution of the family forms the matrix of our society. (*Wisconsin* v. *Yoder* (1972) 406 U.S. 205, 231-233 [32 L.Ed.2d 15, 34-35, 92 S.Ct. 1526]; *Stanley* v. *Illinois* (1972) 405 U.S. 645 [31 L.Ed.2d 551, 92 S.Ct.

---

[4] Under 42 United States Code section 606(e)(i) and the implementing federal regulation (45 C.F.R. § 233.120(a)(4)), federal funding may be used by the state to supply emergency shelter to homeless families with needy children. (*Koster* v. *Webb* (E.D.N.Y. 1983) 598 F.Supp. 1134, 1137.)

1208].) "It is through the family that we inculcate and pass down many of our cherished values, moral and cultural. [Fn. deleted.]" (*Moore* v. *East Cleveland* (1977) 431 U.S. 494, 503-504 [52 L.Ed.2d 531, 539-540, 97 S.Ct. 1932].) In *Lehr* v. *Robertson* (1983) 463 U.S. 248, 256 [77 L.Ed.2d 614, 623, 103 S.Ct. 2985], Justice Stevens observed: "The intangible fibers that connect parent and child have infinite variety. They are woven throughout the fabric of our society, providing it with strength, beauty, and flexibility." The unique ability of a parent to give love, guidance, protection, and encouragement to his or her child, lies at the very heart of the parental relationship. (*Rivera* v. *Minnich* (1987) 483 U.S. __, __ [97 L.Ed.2d 473, 480, 107 S.Ct. 3001]; *Lehr* v. *Robinson, supra,* 463 U.S. at p. 261 [77 L.Ed.2d at p. 626].)

In 1982, the California Legislature enacted Senate Bill No. 14. ■ The purpose of this measure is to bring California's child welfare laws into conformance with the philosophy of Public Law No. 96-272. (2 Cal. Juvenile Court Practice, (Cont. Ed. Bar Supp. 1986) § 15.3, p. 3.) DSS is mandated by this law to provide "social services which are directed toward the accomplishment of the following purposes: (a) protecting and promoting the welfare of all children, including handicapped, homeless, dependent, or neglected children; (b) preventing or remedying, or assisting in the solution of problems which may result in, the neglect, abuse, exploitation, or delinquency of the children; (c) preventing the unnecessary separation of children from their families by identifying family problems, assisting families in resolving their problems, and preventing breakup of the family where the prevention of child removal is desirable and possible; . . . Child welfare services may include, but are not limited to: . . . emergency shelter care . . . ." (§ 16501.)

Child welfare services consists of three components: Preplacement Preventive Services (§ 16501.1); Family Reunification Program (§ 16501.2); and Permanent Placement (§ 16501.3). Preplacement Preventive Services are "designed to help children remain with their families by preventing or eliminating the need for removal." This component contains two subparts, the first of which, the Emergency Response Program, provides, ". . . intake services and crisis intervention to maintain the child safely in his or her own home or to protect the safety of the child." (§ 16501.1, subd. (a).) The second component, the Family Maintenance Program, ". . . is designed to provide time-limited protective services to prevent or remedy neglect, abuse, or exploitation, for the purposes of preventing separation of children from their families." (§ 16501.1, subd. (b).)

The Family Reunification Program is intended to provide social services ". . . when the child cannot safely remain at home, and needs temporary foster care, while services are provided to reunite the family." (§ 16501.2.)

The purpose of the Permanent Placement Program is to provide "an alternative permanent family structure for children who because of abuse, neglect, or exploitation cannot safely remain at home and who are unlikely ever to return home." (§ 16501.3.)

Emergency shelter care is made available under all three components of the Child Welfare Act. (§§ 16504.1; 16506.1; 16507.1; and 16508.1.)

C. *The Legislative Intent of Term "Emergency Shelter Care" as Contained in Welfare and Institutions Code Section 16500 et seq.*

Section 16504.1 directs DSS to provide services to children in the form of "emergency shelter care." DSS provides such care to homeless children. ■ However, DSS asserts that section 16504.1 does not require it to assist homeless families to obtain housing. The position of DSS is that destitute families who are homeless, but intact, are not entitled to any sum, beyond the amount of their monthly AFDC grant, to be used to secure safe and adequate shelter. In other words, homeless children are eligible to receive emergency shelter care, provided that such children have been, or are in the process of being, removed from their homes.

DSS operates its child welfare service program under the assumption that it is the intent of the Legislature that "emergency shelter care," as mentioned in section 16504.1, be solely provided to a neglected or abused child during the period that the child is initally removed from his or her home for the purpose of evaluating the need for state intervention and protection. This position is reflected in the DSS regulations which provide that "emergency shelter care" be limited to a child "who must be immediately removed from his/her home." (Manual of Policies and Procedures § 30-002(z)(3).)

Petitioners contend that DSS's regulations have added an eligibility requirement that is not contained within the language of section 16504.1. They assert that the plain meaning of the statute is that "emergency shelter care" shall be provided to all homeless children, whether or not separated from their families.

■ In weighing these respective arguments, we start with the prescript that laws governing welfare programs are to be "liberally interpreted and actively enforced." (*Robbins* v. *Superior Court* (1985) 38 Cal.3d 199, 208

[211 Cal.Rptr. 398, 695 P.2d 695].); *County of Los Angeles* v. *Workers' Comp. Appeals Bd.* (1981) 30 Cal.3d 391, 401 [179 Cal.Rptr. 214, 637 P.2d 681].) ▆ Thus, the term "emergency shelter care," accorded its broad meaning, requires DSS to provide such care to homeless families.

DSS is unable to cite legislative history or other indicia which suggest that the Legislature did not intend to provide emergency shelter care to homeless families. DSS calls our attention to the fact that child welfare services are available to families regardless of wealth. (§§ 16504, 16506.) Thus, an abused child of affluent parents is entitled to protection afforded under this act. From this, DSS deduces that providing benefits to homeless families makes no sense, citing as its supporting example an hypothetical family which has been evicted from its home, but which has, nevertheless, the sum of $5,000 in the bank and an income of $2,000 per month.

It is in no way apparent how, in actual practice, an hypothetical family of such financial means may be deemed to be in such economic straits as to present an "emergency situation." Even under the most tortured of logic, such a family would fail to qualify for emergency shelter under the act.

DSS also defends its regulation upon the theory that there is statutory language which indicates that the Legislature did not intend DSS to provide emergency shelter care to homeless families. Specifically, DSS alludes to the fact that emergency shelter care is available under two other components of the Child Welfare Services Program: Family Reunification (§ 16507.1) and Permanent Placement. (§ 16508.1.) Both of these components come into play after the child has been removed from his or her parents. It postulates that, where the same phrase is used more than once in a statutory scheme, it must be given the same meaning throughout. (*Alhambra Cons. Mines, Inc.* v. *Alhambra Shumway Mines, Inc.* (1966) 239 Cal.App.2d 590, 595 [49 Cal.Rptr. 38].) Thus, DSS deduces, in order for the term "emergency shelter care," as set forth in section 16506.1, to have the same meaning throughout the scheme, the Legislature must have intended that emergency care be provided at the time that initial intake and crisis intervention occurs.

We are not persuaded by the DSS argument. Social services provided through the operation of the Family Reunification and Permanent Placement programs are expressly limited to children "who cannot safely remain at home." There is no such limitation contained in the statutory language governing the Preplacement Preventive Services component. ▆ "Where a statute on a particular subject omits a particular provision, the inclusion of such a provision in another statute concerning a related matter indicates an intent that the provision is not applicable to the statute from which it was omitted." (*Marsh* v. *Edwards Theaters Circuit, Inc.* (1976) 64

Cal.App.3d 881, 891 [134 Cal.Rptr. 844].) ▆▆ We conclude that the Legislature's failure to include similar limitation upon homeless children who are at risk, but still residing with their parents, is a manifestation of its intent that all children be intended beneficiaries of emergency shelter care.

▆▆ "Statutes relating to the same subject must, wherever possible, be reconciled in order to retain their force." (*Mark F.* v. *Superior Court* (1987) 189 Cal.App.3d 206, 211 [234 Cal.Rptr. 388].) The DSS analysis fails to consider legislative intent manifest in the Child Welfare Services Act as well as California's overall legislative scheme governing the welfare of the youth of this state.

As stated, one of the purposes of the enactment of the Child Welfare Services Act is to ensure that as few children as possible be ensnared in the foster care network. It is recognized by Congress that this goal may be best accomplished by providing, whenever feasible, child welfare services appropriate to the family, and that such services be rendered "to prevent or eliminate the need for removal of the child from his home . . . ." (42 U.S.C. § 671(15)(A); see also 42 U.S.C. § 625(a)(1)(C).)

It is widely recognized that children have strong emotional ties to even the "worst" of parents. (Goldstein, Freud & Solnit, Beyond the Best Interests of the Child (1973) at pp. 19-20; Kay & Phillips, *Poverty and the Law of Child Custody* (1966) 54 Cal.L.Rev. 717.) "Continuity of relationships is extremely important to children. [Fn. omitted.] Removing a child from his family may cause serious psychological damage—damage more serious than the harm intervention is supposed to prevent. [Fn. omitted.]" (Wald I, *supra,* 27 Stan.L.Rev. at p. 994.)

Judicial intervention into the integrity of the family is neither a desirable nor a recommended disposition. (§ 396; *In re Marriage of Mentry* (1983) 142 Cal.App.3d 260, 270 [190 Cal.Rptr. 843]; *In re Jeremy C., supra,* 109 Cal.App.3d 384, 393 [167 Cal.Rptr. 283].) "It is now the prevailing ethic among child care experts that foster care has been overused as a means of protecting children. [Fn. omitted.] Although still widely used, foster care is considered generally to be a worse alternative than leaving a child in the home. . . ." (Wald, *State Intervention on Behalf of "Neglected Children": Standards for Removal of Children from Their Homes, Monitoring the Status of Children in Foster Care, and Termination of Parental Rights* (1976) 28 Stan.L.Rev. 625, 644.)

It is the purpose of the Juvenile Court Act that the bond between a minor and his or her family be "preserve[d] and strengthen[ed]" (§ 202) through the provision of appropriate services. (§ 307, subd. (a).) ▆▆ "The legisla-

tive scheme contemplates immediate and intensive support services to reunify a family where a dependency disposition removes a child from parental custody." (*In re John B.* (1984) 159 Cal.App.3d 268, 274 [205 Cal.Rptr. 321]; see also § 361, subd. (b); Cal. Rules of Court, rule 1377(c).)

The preservation of the family unit is also an objective which courses throughout the body of California's laws governing the AFDC program. It is the often expressed intent of the Legislature that all reasonable efforts be made to prevent the unnecessary separation of children from their parents. "From the outset AFDC has sought to provide for the financial needs of families with dependent children so that the children may remain in their home [*sic*]. [Citation.]" (*Vaessen v. Woods* (1984) 35 Cal.3d 749, 755 [200 Cal.Rptr. 893, 677 P.2d 1183].) The Legislature has recognized that ". . . the family unit is of fundamental importance to society in nurturing its members, passing on values, averting potential social problems, and providing the secure structure in which citizens live out their lives. . . . Each family has the right and responsibility to provide sufficient support and protection of its children, to raise them according to its values and to provide every opportunity for educational and social progress." (§ 11205.)

Section 10000 provides, in part, that the purpose of those laws governing the operation of public assistance programs ". . . is to provide for protection, care, and assistance to the people of this state in need thereof, and to promote the welfare and happiness of all of the people of the state by providing appropriate aid and services to all of its needy and distressed. It is the legislative intent that aid shall be administered and services provided promptly and humanely, with due regard for the preservation of family life . . . ."

The DSS regulation under review is subversive of these goals, in that its application has the actual potential of needlessly forcing homeless families into the clutches of child dependency proceedings, and thereby effecting the disintegration of families. For example, in order for its children to secure shelter, the homeless family is forced under present DSS regulations to choose between either remaining homeless, with family members together, or the placing of its children in foster care, with the attendant risk of permanent alienation of the child from his or her family. (E.g., see *In re Cheryl E.* (1984) 161 Cal.App.3d 587, 594-595 [207 Cal.Rptr. 728].)[5] In

---

[5] The above illustration is neither unique nor hypothetical. One such example is that of the indigent mother of Cheryl E., who signed a relinquishment for adoption form due, in large part, to her inability to secure adequate shelter for her infant daughter. (*Id.* 161 Cal.App.3d at p. 595.) Two plaintiffs in the *Hansen* case filed declarations in support of their application for a preliminary injunction, stating that they gave up custody of their children in order to obtain shelter for them.

other instances, a family that is unable to secure "a home or suitable place of abode" runs the risk of having its children made subject to the jurisdiction of the juvenile court and, in many cases, of their being placed in foster care. (§ 300, subd. (b); *In re Jack H.* (1980) 106 Cal.App.3d 257, 266 [165 Cal.Rptr. 646].)[6]

The plight of the homeless AFDC family often considerably worsens once their children are removed to foster care, in that the loss of AFDC eligibility follows the loss of custody. In the absence of appropriate assistance, parents in these circumstances become even less able to afford adequate housing than they were prior to the loss of their children. Consequently, what is intended to be temporary foster care due to the family's inability to secure housing, has been known to result in the permanent separation of parent from child.

▪ We find that the objective sought to be achieved by section 16504.1 is that of promoting the preservation and protection of the family unit. ▪ It is obvious that a regulation that requires the removal of a child from his or her family in order to interpose social services with the ostensible purpose of providing shelter for such child, contradicts and subverts the primary purpose of our child welfare laws.

DSS notes that family maintenance services are available in situations in which the child may remain in his or her "own home." (§ 16504.) It asserts that the language of this section suggests that the Legislature intended the statutes to apply in those instances in which the parents are able to provide shelter.

Under section 16501.1, preplacement welfare services are intended to "maintain the child safely in his or her own home or to protect the safety of the child." There is no question that a homeless child is in perilous circumstances.

In winter, a homeless child may be exposed to the elements. The temporary quarters of the homeless family may, in all likelihood, lack adequate sanitation facilities, and thereby expose a child to disease and pestilence.[7]

---

[6] Two of the plaintiffs in the *Hansen* case filed declarations stating that the county initiated child neglect proceedings to remove their children as of result of their inabilty to secure adequate housing.

[7] The Legislature has declared that "Unsanitary, unsafe, overcrowded, or congested dwelling accomodations or *lack of decent housing* constitute conditions which cause an increase in, and spread of, disease and crime." (Health & Saf. Code § 50001, subd. (b). Italics added.) Declarations filed by the plaintiffs give firsthand accounts of the harmful effects of homelessness upon the physical health of children. The homelessness of children reportedly con-

For want of a stable home environment, a homeless child becomes a likely candidate for emotional trauma.[8] Homelessness makes it difficult for a child to attend school on a regular basis, if at all. (E.g., see *Delgado* v. *School Dist.* (1986) 131 Misc.2d 102 [499 N.Y.S.2d 606].)[9] It is, therefore, our conclusion that child welfare services are to be provided in all instances in which it is reasonable to anticipate that the safety and well-being of the child are at risk, and that such services are to be provided without regard to whether the child has, or lacks, shelter.

D. *Related Statutes Governing the Provision of Emergency Shelter to Children Demonstrates Legislative Concern That Emergency Shelter Be Provided to Homeless Families.*

The enactment of the Child Welfare Services Act must not be viewed as an isolated attempt by the California Legislature to enact a body of laws to protect homeless families. Our Legislature has a long history of enacting laws designed to insure that low income families are provided the opportunity to dwell in housing units which are both safe and adequate. It must be assumed that the Legislature was fully aware of these statutes at the time that it enacted the Child Welfare Act, and that the Legislature intended to maintain a consistent body of laws. (*Fuentes* v. *Workers' Comp. Appeals Bd.* (1976) 16 Cal.3d 1, 8 [128 Cal.Rptr. 673, 547 P.2d 449].)

The problem of homelessness is hardly a recent phenomenon. (See Malone, *Homelessness in a Modern Urban Setting,* 10 Fordham Urb.L.J. 749, 750, fn. 4 (1982).) In California, our Legislature initially confronted the problem of homelessness during the New Deal era. In 1938, it enacted the Housing Authorities Law in an effort to provide safe housing for low-income individuals and families. (2 Deering's Gen. Laws Supp., Act 3483; repealed 1951.) The law was promptly attacked as being an illegal expenditure of public funds. The Supreme Court, in rejecting this challenge, made the following observation: ". . . [I]t is our view, and we are satisfied that both reason and authority support us, that the proposed elimination of

tributes to a high incidence of problems such as upper respiratory infections, lice, scabies, skin infections, and gastrointestinal ailments.

[8] The plaintiffs in *Hansen* presented the trial court with the declaration of Doctor Ellen L. Bassuk, an Associate Professor of Psychiatry at the Harvard Medical School. Doctor Bassuk stated that she had recently completed a study of psychological consequences of homelessness upon 151 children. She reportedly discovered that homeless children were significantly more developmentally retarded than comparable children from the middle and lower classes. Doctor Bassuk concluded that homeless "children manifest symptoms of dire psychological distress. The most common symptoms are associated with severe anxiety and depression. Moreover, a greatly disproportionate number of homeless children are failing to develop normally in several important ways."

[9] Doctor Bassuk's declaration states that 43 percent of the children that she studied had repeated a grade, and that 25 percent of the children were enrolled in special classes.

slums and the erection of safe and sanitary low-rent dwelling units for persons of the prescribed restricted income will do much to advance the public welfare and to protect the public safety and morals and are in fact and law public purposes." (*The Housing Authority* v. *Dockweiler* (1939) 14 Cal.2d 437, 450 [94 P.2d 794].)

In 1970, the Legislature again expressed its concern that the housing needs of low-income families were not being met. The Legislature found that ". . . there continues to exist throughout the state a seriously inadequate supply of safe and sanitary dwelling accommodations for persons and families of low income. This condition is contrary to the public interest and threatens the health, safety, welfare, comfort and security of the people of this state." (Health & Saf. Code, § 33250; see also *Henrioulle* v. *Marin Ventures, Inc.* (1978) 20 Cal.3d 512, 519 [143 Cal.Rptr. 247, 573 P.2d 465].) It declared the federal policy (as set forth in 42 U.S.C. § 1441), of ". . . a decent home and a suitable living environment for every American family . . ." to be a "priority of the highest order." (Health & Saf. Code, § 50002; see also former Health & Saf. Code, §§ 37120 et seq., 42000, 41003, 41002, and 41004.)

With the intensification of social problems attending inadequate housing for families came the heightened concern of this state's lawmakers, as reflected in subsequent legislation. In 1977, it was declared that ". . . there exists within the urban and rural areas of the state a serious shortage of decent, safe, and sanitary housing which persons and families of low or moderate income, including the elderly and handicapped, can afford." (Health & Saf. Code, § 50003.) The Legislature stated that it was a ". . . public purpose to encourage the availability of adequate housing and home finance for persons and families of low or moderate income . . . ." (Health & Saf. Code, § 50004; see also *Knight* v. *Hallsthammar* (1981) 29 Cal.3d 46, 53, fn. 3 [171 Cal.Rptr. 707, 623 P.2d 268].)

Government Code section 65580, enacted in 1980, declares: "The availability of housing is of vital statewide importance, and the early attainment of decent housing and a suitable living environment for every California family is a priority of the highest order." California Administrative Code, title 25, section 6438, implementing Government Code section 65580, requires that county and cities examine the housing needs of large families, minority households, the elderly, and the handicapped.

Legislative concern notwithstanding, the plight of low and moderate income families in locating housing came to be of epidemic proportion as the decade of the 1970's drew to a close. (See *Marina Point, Ltd.* v. *Wolfson* (1982) 30 Cal.3d 721, 743 [180 Cal.Rptr. 496, 640 P.2d 115, 30 A.L.R.4th

1161].)[10] In 1980, the Legislature found to exist a ". . . severe shortage of affordable housing, especially for persons and families of low and moderate income . . . ." (Gov. Code, § 65913.)

In 1984, the Legislature made the determination that, ". . . because of economic, physical, and mental conditions that are beyond their control, thousands of individuals and families in California are homeless. Churches, local governments, and nonprofit organizations providing assistance to the homeless have been overwhelmed by a new class of homeless: families with children . . . ." (Stats. 1984, ch. 1691.) The shortage of housing was found to be "inimical to the health, safety, and welfare of the residents of this state and sound growth of its communities." (Health & Saf. Code, § 50003.3.) The Legislature concluded it to be of "vital statewide importance" that an emergency fund be created to supplement temporary shelter progams for homeless families. (*Ibid.*; see also Health & Saf. Code, § 50001, subd. (b).)[11] It declared that, in order to remedy the problem, it is necessary to make the "[m]aximum utilization of state, local, and federal subsidies available to meet the emergency shelter needs of the homeless." (Health & Saf. Code, § 50003.3, subd. (b).)

The use of the Child Welfare Services program to help homeless families to obtain decent emergency shelter is appropriate under state and federal law. Such action is in keeping with the notion that our public social service programs humanely provide for the needs of families with dependent children. (§ 10000; *Robbins* v. *Superior Court, supra,* 39 Cal.3d at pp. 208-209.)

It has been estimated that there are approximately between two and three million homeless individuals in this nation. (*Clark* v. *Community for Creative Non-violence* (1984) (Marshall dissenting) 468 U.S. 288 , fn. 4 [82 L.Ed2d 221, 233, 104 S.Ct. 3065]; New York *Times,* May 2, 1984, at p. 1.) A recent study conducted by the United States Conference of Mayors reported that 28 percent of the homeless are families with children. (The Continued Growth of Hunger, Homelessness, and Poverty in America's

---

[10] We are reminded of an observation made by Will Rogers during the Depression: "Last year we said: 'Things can't go on like this.' And they didn't—they got worse." (Sterling, The Best of Will Rogers (1979) at p. 95.)

[11] Health and Safety Code section 50001 provides: "The Legislature finds and declares that the subject of housing is of vital statewide importance to the health, safety, and welfare of the residents of this state, for the following reasons: [¶] (a) Decent housing is an essential motivating force in helping people achieve self-fulfillment in a free and democratic society. [¶] (b) Unsanitary, unsafe, overcrowded, or congested dwelling accommodations *or lack of decent housing* constitute conditions which cause an increase in, and spread of, disease and crime. [¶] (c) A healthy housing market is one in which residents of this state have a choice of housing opportunities and one in which the housing consumer may effectively choose within the free marketplace. [¶] (d) A healthy housing market is necessary both to achieve a healthy state economy and to avoid an unacceptable level of unemployment."

Cities: (1986) p. 2.) "By far, the most significant change in the cities' homeless population has been in the number of families with children, with four out of five of the survey cities reporting that the number of families seeking emergency shelter has grown. In seventy-two percent of the cities, families comprise the largest group for whom emergency shelter and other needed services are particularly lacking." (*Id.*)

CONCLUSION

We conclude that, in view of the Legislature's repeated manifestation of concern for the dire shortage of housing for low-income families, "emergency shelter," as stated in section 16504.1, must be given a broad meaning. DSS's narrow interpretation of this provision would render meaningless a major component of this state's program of child welfare services.

Our society can ill afford to ignore the alarming plight of our homeless population. (*Collier* v. *Menzel* (1985) 176 Cal.App.3d 24, 36 [221 Cal.Rptr. 110].) This admonition is especially true with respect to the needs of homeless children. "An administration of the welfare program that discards statutory mandate to reduce relief to the indigent young cannot be sustained. A society that sacrifices the health and well-being of its young upon the false altar of economy endangers its own future, and, indeed, its own survival." (*Cooper* v. *Swoap, supra,* 11 Cal.3d 856, 872-873 [115 Cal.Rptr. 1, 524 P.2d 97].) The California Legislature has enacted a body of law designed to render assistance to homeless families. It is our obligation as a court to ensure that these measures be actively and humanely enforced. (*Cooper* v. *Swoap, supra,* 11 Cal.3d at p. 864.) DSS must act not only in a manner consistent with the intent and purpose of this legislation, but must act with the reasonable understanding of the practical demands of the circumstances with which individual homeless families are faced.

DSS's interpretation of section 16504.1 not only flies in the face of the provision's clear language (*Lister* v. *Superior Court* (1979) 98 Cal.App.3d 64 [159 Cal.Rptr. 280]), it also runs counter to the objective of federal and state child welfare services legislation that social services be provided in such manner as to prevent the unnecessary separation of children from their families. (42 U.S.C. §§ 625(a)(1)(C); 671(15)(A); 16501.1, subd. (b).) Moreover, DSS's interpretation disregards well-settled prescript that laws governing public social service programs be liberally construed to effect the stated objects and purposes of the program. (*Robbins* v. *Superior Court, supra,* 38 Cal.3d at pp. 208-209.)

In *Hansen* v. *Department of Social Services,* case number B021106, we find the trial court's order, enjoining DSS from defining emergency shelter

care "so as to exclude homeless children, regardless of whether homeless children remain with their parent(s), guardian(s), or caretaker(s)," to be consistent with the Legislature's clear and express statewide policy to meet, when reasonably possible, the housing needs of low-income families. The order granting the preliminary injunction is affirmed.

In *Montes* v. *Superior Court,* case number B012398, let a writ of mandate issue directing respondent superior court to set aside its order denying the motion for summary judgment and to reconsider said motion according to the views expressed in this opinion.[12]

Stone, P. J., and Gilbert, J., concurred.

A petition for a rehearing was denied July 28, 1987, and the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied October 1, 1987.

---

[12] In light of our ruling, we need not reach the remaining statutory and constitutional arguments raised in *Montes.* (*Harris* v. *McRae* (1980) 448 U.S. 297, 306-307 [65 L.Ed.2d 784, 797-798, 100 S.Ct. 2671].)