Filed 5/9/13  W.J. v. Super. Ct. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| W.J.,<br><br>        Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF<br>SAN BERNARDINO COUNTY,<br><br>        Respondent;<br><br>SAN BERNARDINO COUNTY<br>CHILDREN AND FAMILY SERVICES,<br><br>        Real Party in Interest. | E058012<br><br>(Super.Ct.Nos. J246776, J246777,<br>& J246778)<br><br>OPINION |

ORIGINAL PROCEEDINGS; petition for extraordinary writ.  Gregory S. Tavill, Judge.  Petition denied.

Gloria Gebbie for Petitioner.

No appearance for Respondent.

Jean-Rene Basle, County Counsel, and Adam E. Ebright, Deputy County Counsel, for Real Party in Interest.

Petitioner W.J. (Mother) filed a petition for extraordinary writ pursuant to California Rules of Court, rule 8.452, challenging the juvenile court's jurisdictional and dispositional orders as to her three children, and setting a Welfare and Institutions Code[1] section 366.26 hearing. Mother argues that: (1) her due process rights were violated when the juvenile court added an additional allegation after the conclusion of evidence; (2) her right to confront and cross-examine witnesses was violated when the juvenile court allowed minors' counsel to question the children in chambers; and (3) the juvenile court erred in denying her reunification services pursuant to section 361.5. We reject these contentions and affirm the judgment.

I

FACTUAL AND PROCEDURAL BACKGROUND

The children came to the attention of the San Bernardino County Children and Family Services (CFS) on November 8, 2012, when then seven-year-old D.J. was complaining of pain to his hands, arms, chest, and leg at school. D.J. reported that his stepfather, J.W., had beat him with an electric cord the previous night for getting in trouble for stealing food from another student at school. The beating resulted in the child suffering from numerous lacerations, welts, and bruises to his arms, legs, back, buttocks, stomach, and chest. J.W. threatened to beat the child more severely if the child did it

---

[1] All future statutory references are to the Welfare and Institutions Code unless otherwise stated.

again.  After the beating, the child was sent to bed without dinner, and he was not given breakfast the following morning despite the fact that the child had been trying to get food at school.  D.J. indicated that he often did not get food at home; school personnel noted that there had been times D.J. had taken food and appeared as though he had not been fed at home.

D.J. also stated that Mother was in another room when he was being beaten by J.W., and Mother did not come in during the beating or check on him after he was beaten.  D.J. further disclosed that Mother had also beaten him in the past with a piece of a broken dresser drawer, and on another occasion with a belt, resulting in a cut to his head and blood gushing from his scalp.  After the beating, Mother made the child clean up the spilled blood.  D.J. also stated that he had seen Mother and J.W. beat his then five-year-old half-sister Z.W. with a belt and an electric cord.[2]  D.J. further reported that he had seen domestic violence between his mother and J.W.  Z.W. confirmed that D.J. had been beaten by J.W.  She also confirmed that her parents had hit her with a belt on the buttocks and back.

All three children were subsequently taken to an emergency room for evaluation and treatment.  D.J. reported that J.W. beat him with an extension cord and that Mother hit him with a belt.  He also stated that Mother had seen J.W. with the extension cord and had heard him crying during the beating.  D.J. had multiple lacerations, bruises, and welts all over his body, and there were numerous older injuries on his body that were consistent

---

[2]  J.W. is the father of Z.W. and her 17-month-old sister.  J.W. is not a party to this appeal.

3

with belt or extension cord lacerations. The treating doctor reported that she had found severe contusions, too numerous to document, on D.J.; that D.J. had defensive wounds on his hands; and that the lacerations and hematomas on D.J. would leave scars. The doctor also noted that D.J.'s injuries were inflicted on top of older injuries and were so extensive that they covered up some evidence of prior injuries. The doctor concluded D.J.'s injuries were clearly the result of child abuse. The two younger children had no visible injuries.

When police officers contacted Mother, Mother lied to the police, claiming that J.W. was her brother, that she was not at home during the beating, and that she did not know the child was being beaten by J.W. She also stated that she did not see any injuries on D.J. or notice that D.J. appeared to be in pain. Z.W., however, reported that Mother was in the living room while J.W. was beating D.J. Mother further denied beating any of the children. The police searched the home and found an extension cord that was covered in a red substance, believed to be blood. They also found blood on a pillow on D.J.'s bed, on a towel in the bathroom, and smeared on the wall. The police also interviewed a neighbor who reported that she had seen Mother hitting the children with a belt, a tree twig, and grabbing them by the hair to slap them on numerous occasions.

J.W. and Mother were arrested for child endangerment. J.W. admitted at the police station that he had beaten D.J. with an electric cord due to the child's ongoing behavioral issues. J.W. believed the child may have Attention Deficit Hyperactivity Disorder (ADHD). Mother continued to deny knowing anything about D.J.'s injuries, claiming they discipline the children by making them do chores. Mother also stated that

4

they had been having problems with D.J.'s behavior issues and that the child had been diagnosed with ADHD. After seeing D.J.'s injuries, Mother later agreed that the injuries were excessive.

On November 13, 2012, CFS filed petitions on behalf of the children pursuant to section 300, subdivisions (a) (serious physical harm), (b) (failure to protect), (c) (serious emotional damage), (g) ( no provision for support), and (j) (abuse of sibling). The children were formally detained at the detention hearing and placed in a foster home. The parents were provided with supervised visitation upon release from custody, and ordered to submit to random drug testing. The parents were also informed that they might not be provided with reunification services pursuant to section 361.5.

In a jurisdictional/dispositional report, the social worker recommended that the allegations in the petition be found true, that no reunification services be provided to the parents, and that a section 366.26 hearing be set. The social worker noted that Mother had minimized and lied about the discipline of D.J.; that she lied about J.W.'s identity to the police; and that she gave conflicting statements about her whereabouts when J.W. beat D.J. Mother denied any history of domestic violence; however, the social worker found evidence showing that Mother had been a victim in a domestic violence case against J.W. and that J.W. had an order to stay away from Mother. The social worker further pointed out that the abuse was severe and ongoing, and that although D.J. appeared to be the primary target, there were consistent reports that Mother had hit Z.W. as well. In addition, both parents were surprised about being arrested for child abuse, indicating to the social worker that they believed in inflicting physical abuse as a form of

5

discipline; they appeared to be only concerned about being arrested, and did not show any concern about D.J. Neither parent had asked how D.J. was doing or about his medical condition. The social worker believed that returning the children to the parents care would be detrimental given the seriousness of the abuse, the parents' attitudes, Mother's attempts at deception, and the parents' lack of empathy or remorse. The social worker was also concerned that the parents would not benefit from services based on the parents' prior completion of a parenting class and substance abuse counseling.

The social worker further noted that D.J. was in need of counseling and an assessment for medications. Since being in foster care, the child had stated that he wanted to die, and he had purposely urinated on his bed and the floor and was banging his head against the wall. D.J. had also hit his younger sisters and other children, and he had stolen at school and walked out of his classroom. The social worker recommended moving D.J. to a home separate from his sisters; however, the foster parent, who was experienced with caring for children with behavioral and emotional issues, indicated that she would work with the child so he did not have to be moved.[3]

The contested jurisdictional hearing was held on January 30, 2013. At that time, Mother's counsel, before any witnesses were called, requested that the juvenile court speak to the two older children, then eight-year-old D.J. and then five-year-old Z.W., in chambers to discuss their wishes. Mother's counsel also specifically stated, "I don't really want to call them as witnesses. I don't think they need that experience." CFS

_____

[3] D.J. had to eventually be moved to another foster home due to him hitting his sisters.

6

offered to stipulate as to the children's wishes, but Mother's counsel confirmed that she wanted the court to hear from the children personally.

The court thereafter questioned D.J. and Z.W. with their counsel present. The children indicated that they wanted to return to their parents' care and that they wanted to visit J.W. However, they did not understand why they were taken from their parents' care. Additionally, in response to minors' counsel's question of what he thought would happen to him if he got in trouble again, D.J. stated that he would have to "stand at the wall" and that he did not believe J.W. would use "the switch" again because J.W. had told him that day that they would have "lots of fun" when they got home. Z.W. stated that if she got in trouble again, she would "hold the wall, and they [would] whoop me with the metal part of the belt." Minors' counsel also asked whether D.J. and Z.W. had anything else they wanted to tell the judge, and Z.W. asked, "What judge?" Minors' counsel replied, "This is the judge. Did you know that?" Z.W. responded, "Okay. [¶] Can I have some ice cream?" D.J. stated that he would like visits with his dad.

Thereafter, with all the parties present, the court noted that the children desired visits with their mother and father and that they wanted to go home, but that it was clear that neither child understood why the case existed or whether they understood the judge's role. The court offered to have the reporter read back the transcript of the interview if any party desired, but no one asked to have it repeated.

The social worker thereafter testified. In relevant part, the social worker stated that Mother had regularly visited with the children two times a week for two hours; that the visits appeared to have gone well; that the children enjoyed seeing their mother; and

7

that Mother had began attending parenting and anger management classes. In response to the court's inquiry of whether offering services to the parents would be in the children's best interest, the social worker noted that he was "torn" because of the "shocking" abuse. The social worker explained that while the children were bonded with the parents and they wanted to return home, the social worker believed that it would be detrimental to the children to offer services to the parents given Mother's dishonesty with CFS and the police, Mother's failure to protect, Mother's own abuse of the children, the severity of the abuse, the history of domestic violence, and the fact that Mother remained in a relationship with J.W. after the abuse. Mother then briefly took the stand but chose to exercise her Fifth Amendment right and refused to testify about the events that took place on the day D.J. was beaten due to the criminal charges against Mother and J.W.

Following arguments from counsel, the court found the allegations in the petitions to be true. In regards to D.J., the court added another section 300, subdivision (a), allegation indicating that J.W. had whipped D.J. with an electrical cord and that Mother had consented to the child being whipped with the electrical cord. The court denied reunification services to both parents under section 361.5, subdivision (b)(6). The children were declared dependents of the court and maintained in their foster home. The section 366.26 hearing was set for May 30, 2013.

II

DISCUSSION

A.    *Additional Allegation*

Mother contends that her due process rights were violated by the juvenile court's addition of a second section 300, subdivision (a), allegation at the conclusion of evidence. We disagree.

"Since the interest of a parent in the companionship, care, custody, and management of his [or her] children is a compelling one, ranked among the most basic of civil rights [citations], the state, before depriving a parent of this interest, must afford [the parent] adequate notice and an opportunity to be heard." (*In re B.G.* (1974) 11 Cal.3d 679, 688-689; see also *In re Marilyn H.* (1993) 5 Cal.4th 295, 306.) A parent whose child may be found subject to the dependency jurisdiction of the juvenile court has a due process right to be informed of the nature of the hearing, as well as the allegations upon which the deprivation of custody is predicated, so that the parent may make an informed decision whether to appear and contest the allegations. (*In re Wilford J.* (2005) 131 Cal.App.4th 742, 751.) "Notice of the specific facts upon which removal of a child from parental custody is predicated is fundamental to due process." (*In re Jeremy C.* (1980) 109 Cal.App.3d 384, 397.) Notice at the time of the hearing on the merits is not sufficient; the parent is entitled to notice, in writing, "of the specific charge or factual allegations to be considered at the hearing" and "at the earliest practicable time, and in any event sufficiently in advance of the hearing to permit preparation." (*In re Gault*

9

(1967) 387 U.S. 1, 33.)  The juvenile court cannot consider "unalleged actions" in making its jurisdictional findings.  (*In re J.O.* (2009) 178 Cal.App.4th 139, 152, fn. 13.)

In dependency proceedings, as in civil law in general, "amendments to conform to proof are favored, and should not be denied unless the pleading as drafted prior to the proposed amendment would have misled the adversarial party to its prejudice."  (*In re Jessica C.* (2001) 93 Cal.App.4th 1027, 1042 (*Jessica C.*).)  The juvenile court may properly permit amendment of a petition to "correct or make more specific" the factual allegations supportive of the offense charged so long as the very nature of the charge remains unchanged.  (*In re Man J.* (1983) 149 Cal.App.3d 475, 481; see also *In re Andrew L.* (2011) 192 Cal.App.4th 683, 689.)  "'If a variance between pleading and proof . . . is so wide that it would, in effect, violate due process to allow the amendment, the court should, of course, refuse any such amendment.'"  (*Andrew L.*, at p. 689.)

Explaining this concept, the *Jessica C.* court gave the following example: "[S]uppose a petition only alleges, under subdivision (d) of section 300, a variety of specific sexual acts perpetrated by a parent, but the trial judge does not find these are true.  The county then attempts to amend the petition to allege serious emotional damage under subdivision (c) of section 300, based on the idea that any child who would make such allegations, even if false, has obviously been subject to emotional abuse.  Such a tactic would be nothing more than a cheap way to establish dependency without giving the parent adequate notice of dependency jurisdiction under an emotional abuse theory." (*Jessica C.*, *supra*, 93 Cal.App.4th at p. 1042, fn. 14.)

Such a variance does not exist in the present case. Unlike the *Jessica C.* illustration, the juvenile court found the existing allegations of the petition true and added an allegation that conformed to proof. The court added an allegation that J.W. had whipped D.J. with an electric cord and that Mother had agreed to the whipping. The social worker's reports noted that D.J. had stated that Mother was in another room when he was being beaten by J.W.; that Mother had heard him crying; and that Mother did not come in during the beating or check on D.J. after the beating. Z.W. also reported that Mother was in the living room when the beating occurred. Additionally, the factual allegations in the original petition under section 300, subdivision (b), stated that Mother knew or should have known that D.J. was at risk of physical abuse from J.W. and that she failed to protect D.J. from that abuse.

Furthermore, Mother was aware that CFS was asserting that she not only consented to the abuse by J.W., but that she had also perpetuated physical abuse. CFS provided all parties with explicit notice of the issues being litigated, and the court conducted a full hearing affording each party the opportunity to be heard. Mother was also given the opportunity to present evidence in regards to the allegations and what role she played in the abuse, but she opted to assert her Fifth Amendment right rather than testify on her own behalf when she had the opportunity to do so. Mother was not misled or prejudiced by the amendment. Therefore, no error occurred.

B.     *Questioning Minors in Chamber*

Mother also argues that the juvenile court committed prejudicial error when it allowed minors' counsel to question the children in chambers and outside the presence of

11

her and her counsel in violation of her right to confront and cross-examine witnesses. CFS responds that Mother forfeited this contention by failing to raise it below; in the alternative, CFS claims Mother's argument is unmeritorious because she was not denied an opportunity to call the children as witnesses during the hearing and question them in open court.

Section 350, subdivision (b), provides in relevant part: "The testimony of a minor may be taken in chambers and outside the presence of the minor's . . . parents, if the minor's . . . parents are represented by counsel, the counsel is present and any of the following circumstances exist:  [¶]  (1)  The court determines that testimony in chambers is necessary to ensure truthful testimony.  [¶]  (2)  The minor is likely to be intimidated by a formal courtroom setting.  [¶]  (3)  The minor is afraid to testify in front of his or her . . . parents.  [¶]  After testimony in chambers, the . . . parents . . . may elect to have the court reporter read back the testimony or have the testimony summarized by counsel for the parent or parents."

The appellate court in *In re Laura H.* (1992) 8 Cal.App.4th 1689 determined that taking a minor's testimony in chambers without the father's attorney being present was a violation of the father's constitutional right to confront the witness.  (*Id*. at pp. 1694-1696.)  The court also held that a failure to object to this procedure in the juvenile court did not constitute a waiver.  (*Id*. at p. 1695.)

In *In re Jamie R.* (2001) 90 Cal.App.4th 766, counsel stipulated that the minor could be interviewed in chambers without counsel being present.  The minor's mother was present in court when the stipulation was entered into the record and remained silent.

12

The Second District Court of Appeal reasoned that the mother's silence in the face of the stipulation constituted acquiescence to the procedure, and she was precluded from challenging the procedure on appeal. (*Id*. at pp. 771-772.)

The court in *In re Meranda P*. (1997) 56 Cal.App.4th 1143 rejected the reasoning and holding of *Laura H*. The *Meranda P*. court noted that a dependency proceeding is civil, not criminal, in nature and a parent in a dependency proceeding is not entitled to full confrontation and cross-examination. Thus, a parent may waive confrontation rights by acquiescence. (*Id*. at pp. 1157-1158 & fn. 9.)

The record reflects that at the jurisdictional/dispositional hearing Mother's counsel urged that the juvenile court interview D.J. and Z.W. in chambers to discuss their wishes, despite CFS's offer to stipulate as to the children's wishes. Mother's counsel also specifically stated, "I don't really want to call them as witnesses. I don't think they need that experience." The court thereafter questioned D.J. and Z.W. with their counsel present. The children indicated that they wanted to return to their parents' care, but failed to understand the proceedings due to their young ages. Minors' counsel questioned the children about what they thought would happen if they got in trouble again. Both children stated that they would have to "hold the wall," with Z.W. also stating that her parents would "whoop" her with a belt. D.J. stated that he did not believe J.W. would use "the switch" again because J.W. had told him that day that they would have "lots of fun" when they got home. Thereafter, with all the parties present, the court noted that the children desired visits with their mother and father and that they wanted to go home, but that it was clear that neither child understood why the case existed. The court offered to

13

have the reporter read back the transcript of the interview if any party desired but no one asked to have it read back.

Mother's counsel acknowledges that no one asked for a read back, asserting presumably because the court's summary was favorable. She however claims that the "contents of what transpired was unknown until the formal preparation of the record," at which time she discovered minors' counsel had questioned the children outside the presence of other counsel and without giving Mother an opportunity to clarify the children's responses and cross-examine them. She therefore argues that "[a]ny extension beyond" the issue of whether the children wanted to return to their parents "should have at the least been brought to the attention of counsel before, if not at the least after, it was allowed."

There is nothing in the record to indicate that Mother, or any other party, was denied the opportunity to question the children or cross-examine them. In fact, Mother's counsel specifically stated that she did not want to call the children as witnesses. Further, the in chambers questioning of the children was conducted at the behest of Mother's counsel, despite an offer of stipulation as to the children's wishes. Mother also was aware that minors' counsel was in chambers with the children and there is no indication on the record that she did not know that minors' counsel would ask the children questions. Moreover, because Mother failed to ask for a read back following the in chambers interview of the children, despite the court's offer to do so, Mother cannot now complain that her right to question and cross-examine the children was violated merely because she was unaware of what had transpired at that time. Mother had the opportunity

14

to discover the contents of the in chambers interview with the children following the in chambers proceeding, but failed to do so.

Although the better practice is for a parent's attorney to be present during an in chambers interview, and section 350 mandates the attorney's presence, that right can be waived. (*In re Meranda P.*, *supra*, 56 Cal.App.4th at pp. 1155-1158.) Under the facts of this case, we find Mother acquiesced to the procedure followed by the juvenile court and, therefore, has waived any right to challenge this procedure on appeal. (*Ibid.*)

C. *Denial of Reunification Services*

Mother also argues that the juvenile court erred in denying her reunification services and in finding that it was not in the children's best interests to offer her services.

"We affirm an order denying reunification services if the order is supported by substantial evidence." (*In re Harmony B.* (2005) 125 Cal.App.4th 831, 839 [Fourth Dist., Div. Two].) "'In juvenile cases, as in other areas of the law, the power of an appellate court asked to assess the sufficiency of the evidence begins and ends with a determination as to whether or not there is any substantial evidence, whether or not contradicted, which will support the conclusion of the trier of fact. All conflicts must be resolved in favor of the respondent and all legitimate inferences indulged in to uphold the verdict, if possible.'" (*Francisco G. v. Superior Court* (2001) 91 Cal.App.4th 586, 600 (*Francisco G.*).)

Although reunification is a high priority in the dependency system, the Legislature has recognized that, under certain circumstances, it would be fruitless to provide a parent with reunification services. (*Francisco G.*, *supra*, 91 Cal.App.4th at p. 597; *Raymond C.*

*v. Superior Court* (1997) 55 Cal.App.4th 159, 163.) Section 361.5 lists the circumstances where reunification services need not be provided. "Once it is determined one of the situations outlined in subdivision (b) applies, the general rule favoring reunification is replaced by a legislative assumption that offering services would be an unwise use of governmental resources. [Citation.]" (*In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 478.) As relevant here, the circumstances include where there is a substantiated allegation of severe physical abuse. (§ 361.5, subd. (b)(6).)

Section 361.5, subdivision (b)(6), allows the court to deny services if it finds, by clear and convincing evidence, "[t]hat the child has been adjudicated a dependent pursuant to any subdivision of Section 300 as a result of . . . the infliction of severe physical harm to the child, a sibling, or a half sibling by a parent . . . and the court makes a factual finding that it would not benefit the child to pursue reunification services with the offending parent . . . ."

There is clearly substantial evidence to support the conclusion that section 361.5, subdivision (b)(6), mandated the denial of reunification services to both parents. (*In re S.G.* (2003) 112 Cal.App.4th 1254, 1260-1261.) The juvenile court found that both parents were offending parents. The court explained, "The abuse is so substantial and ongoing for such a long period of time, it's clear to the Court that the mother was a participant in the abuse." The court also stated, "[M]other knew about the pattern of abuse. It was ongoing for so long. The mother was a co-participant in the abuse. And so it's the finding of the Court that the whipping with the electric cord was perpetrated by the mother as if she did it herself. She certainly consented to it, authorized it, facilitated

16

it."  The beatings resulted in D.J. suffering from numerous lacerations, welts and bruises to his arms, legs, back, buttocks, stomach, and chest.  The child also had numerous older injuries on his body that were consistent with belt or extension cord lacerations.  He also had numerous severe contusions and defensive wounds on his hands.  The treating doctor noted that the lacerations and hematomas on D.J. would leave scars, and that D.J.'s injuries were inflicted on top of older injuries, covering up some evidence of prior injuries.  Additionally, Mother and J.W. had beat Z.W. with a belt and an electric cord as well.

Second, granting Mother reunification services would not benefit the children. (§ 361.5, subds.(b)(6), (h).)  Subdivision (h) of section 361.5 provides:  "In determining whether reunification services will benefit the child pursuant to paragraph (6) or (7) of subdivision (b), the court shall consider any information it deems relevant, including the following factors:"  These six factors include:  "(1) The specific act or omission comprising the severe sexual abuse or the severe physical harm inflicted on the child or the child's sibling or half sibling.  [¶]  (2) The circumstances under which the abuse or harm was inflicted on the child or the child's sibling or half sibling.  [¶]  (3) The severity of the emotional trauma suffered by the child or the child's sibling or half sibling.  [¶]  (4) Any history of abuse of other children by the offending parent or guardian.  [¶]  (5) The likelihood that the child may be safely returned to the care of the offending parent or guardian within 12 months with no continuing supervision.  [¶]  (6) Whether or not the child desires to be reunified with the offending parent or guardian."  (§ 361.5, subd. (h).)

17

Mother here cruelly and deliberately harmed D.J. She silently stood by while J.W. severely whipped D.J. with an electric cord, despite his crying, suffering, and pain. And after the beating, she failed to check on D.J.'s emotional or physical well-being. Moreover, she had also physically abused D.J. and Z.W. D.J. reported that Mother had previously beaten him with a piece of broken dresser drawer and that she had once beaten him so severely on his head that his scalp was bleeding. D.J. also noted that Mother thereafter made him clean up his spilled blood. The physical evidence found in the parents' home corroborated the children's statements. Police found an electric cord encrusted with a child's blood, a blood-stained pillow in D.J.'s room, and a wall smeared with blood. Additionally, the record revealed that Z.W. was also beaten with a belt and an electric cord; that the parents had engaged in domestic violence in front of the children; that D.J. was often denied food; and that D.J. suffered from emotional issues. Moreover, the record shows that Mother had demonstrated her lack of concern for the children through her dishonesty, denial, and the fact that she remained in a relationship with J.W. after the abuse. Although Mother regularly visited the children, the visits appeared to go well, the children desired to be with the parents, and Mother had engaged in services, considering the severity of the ongoing abuse, Mother's dishonesty, denials, history of domestic violence, and Mother's continued relationship with J.W., granting Mother services would not be in the children's best interests.

When the prerequisites of section 361.5, subdivision (b)(6), are met, the juvenile court "shall not" order reunification services for the offending parent unless it finds, "by clear and convincing evidence, that reunification is in the best interest of the child."

18

(§ 361.5, subd. (c).) "'"[O]nce it is determined one of the situations outlined in subdivision (b) applies, the general rule favoring reunification is replaced by a legislative assumption that offering services would be an unwise use of governmental resources. [Citation.]'" [Citation.] The burden is on the parent to change that assumption and show that reunification would serve the best interests of the child." (*In re William B.* (2008) 163 Cal.App.4th 1220, 1227.) As explained previously, Mother here cannot meet that burden.

Accordingly, there was substantial evidence to support the court's denial of reunification services. (*Tyrone W. v. Superior Court* (2007) 151 Cal.App.4th 839, 852-853.)

### III

### DISPOSITION

The petition is denied.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

HOLLENHORST
Acting P. J.

We concur:

McKINSTER
J.

CODRINGTON
J.