Filed 10/2/20

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| In re S.S., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E074852 |
| Plaintiff and Respondent, | (Super.Ct.No. RIJ1800321) |
| v. | OPINION |
| T.S., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County. Cheryl Murphy, Judge. Reversed with directions.

Elizabeth Klippi, under appointment by the Court of Appeal, for Defendant and Appellant.

Gregory P. Priamos, County Counsel, James E. Brown, Anna M. Marchand, and Julie Koons Jarvi, Deputy County Counsel for Plaintiff and Respondent.

This appeal poses the question whether a juvenile court may, consistent with due process and the dependency statutes, terminate the parental rights of a noncustodial father who seeks custody even though the state detained and removed the child based only on allegations against mother and the court found giving father custody would be detrimental based on problems arising from his poverty.

The Riverside County Department of Public Social Services (department) filed a petition seeking to remove an 18-month old girl based on mother's substance abuse and mental health issues and noncustodial father's failure to provide for her. (Welf. & Inst. Code, § 300, subds. (b)(1) & (g)(1), unlabeled statutory citations refer to this code.) However, after the child was detained, father came forward and said he had been trying to reunify with her since mother took the child when she was about four months old. He also said he had established his paternity through a genetic test and had been paying child support to mother throughout their separation.

Father said he couldn't yet take custody of the child because his housing, transportation, and employment weren't stable, but he indicated he had obtained work and was attempting to find suitable housing. He also indicated he would return to Chicago, his home city, and live with relatives who were willing to help him raise her once he obtained custody.

The department properly amended the petition to remove the allegations against father before the jurisdiction and disposition hearing. They maintained the child should be removed from both parents and asked the trial court to find by clear and convincing

evidence that placing the child with her parents would pose a substantial danger to her health, safety, or well-being. The department indicated both parents were entitled to six months of family reunification services, but due to the child's young age their parental rights could be terminated at the six-month review hearing. The court agreed with these recommendations, including by finding under the clear and convincing evidence standard that it would be detrimental to return the child to father's custody.

At the six-month review hearing in February 2019, the court terminated both parents' reunification services and, in January 2020, terminated their parental rights. Father had filed a section 388 petition claiming his situation had changed, noting he had gained permanent full-time employment with benefits as well as a permanent place to live, but the court denied his motion at the same hearing, concluding he had shown his circumstances were changing, but not that they had changed.

Father argues the entire procedure violated his due process rights and there wasn't adequate support for the trial court's finding that giving him custody would be detrimental to the child.[1] We hold a juvenile court may not terminate parental rights based on problems arising from the parent's poverty, a problem made worse, from a due process standpoint, when the department didn't formally allege those problems as a basis for removal. Absent those impermissible grounds for removal there wasn't clear and

---

[1] Mother agreed to the termination of her parental rights in the trial court and isn't a party to this appeal.

convincing evidence that returning the child to father would be detrimental to her. We therefore reverse the termination of father's rights and remand for further proceedings.

# I

# FACTS

A. *The Referral, Petition, and Detention Hearing*

The child, Serenity, and her family came to the department's attention on May 3, 2018, when they received a general neglect referral reporting mother was at a governmental office with a child seeking housing assistance and she appeared to be intoxicated and was anxious, shaking, and unable to speak.[2] The family is black. The referral said mother took the child out of her stroller and shook her twice to get her attention and quiet her, though it noted she didn't shake her hard.

Just over a week later, a department social worker interviewed mother at her apartment. The social worker said, when mother came out, she was pacing, physically clumsy, had difficulty concentrating, and spoke rapidly and sometimes nonsensically. Mother said she'd been diagnosed with schizophrenia, attention deficit disorder, and bipolar disorder but she wasn't in therapy or on medication. She admitted to smoking marijuana but denied other substance use. She said she was under a lot of stress because she was in the process of being evicted.

---

[2] Serenity's half sister was involved in the case, but she has a different father, so her situation isn't relevant to this appeal.

The social worker inspected the apartment and observed a substandard living environment. She found a great deal of trash on the floor and kitchen counters filled with trash and dirty dishes. She discovered the bathroom lacked running water and there was minimal food in the refrigerator. Mother agreed to take an oral saliva drug test and tested positive for methamphetamines and amphetamines. She explained the result by saying she had fallen at a party and took Vicodin or Tramadol a friend gave her for the pain.

Mother identified father as Serenity's biological father but didn't provide contact information. The social worker tried to contact him using a phone number in the referral, but the number didn't work. The department then began standard efforts to locate the father.

On May 15, 2018, the department filed a petition asserting Serenity was in need of court protection. They alleged mother abused amphetamine and methamphetamine, lived a transient and unhealthy lifestyle, suffered from untreated bipolar disorder and schizophrenia, and had a criminal conviction for child endangerment for which she would remain on probation until March 2021. She also had a history with child welfare services in Texas involving another child, who was placed with a different father. (§ 300, subd. (b)(1).) The department alleged Serenity's father wasn't a member of the household, his whereabouts were unknown, and he therefore failed to provide Serenity with food, clothing, shelter, and medical treatment. (§ 300, subd. (g)(1).) The department recommended leaving Serenity in mother's care but removing her from father.

Mother was present at the detention hearing, but father wasn't there and wasn't assigned counsel. At the hearing, county counsel changed their recommendation and asked the court to detain the child from mother as well as father. The court found the department had made a prima facie showing Serenity fell within the statutory protections of section 300, subdivisions (b)(1) and (g). This determination rested solely upon evidence concerning mother's conduct and father's absence, as no other information was provided about him in the social worker's report or at the hearing.

The court removed Serenity from mother's custody. Though father hadn't appeared, the court ordered the department to provide reunification services for *both* parents, directed mother *and* father should be tested for alcohol and drugs, and that *both* should receive parenting education, substance abuse treatment, and counseling. The court also ordered twice-weekly supervised visits for mother and visits for father, if he appeared, as the department determined to be appropriate.

B. *Father's Appearance*

In June 2018, father contacted the department and let them know he was living in Temecula. The parents were in a committed relationship when the minor was conceived. Father said they married when they moved to California, before Serenity was born, but had separated later, and mother had made it difficult to see the child since then. He said he hadn't been in contact with mother because she was hostile and made threats against him. Mother reported father is listed as Serenity's father on her birth certificate. She said

she has a child support case for Serenity, and father reported he was paying child support to mother. The department found father had no criminal history.

Father reported he was unable to make visits with the child because he didn't have transportation from Temecula. However, at father's initiative, the department arranged an online video visit with the child and noted no concerns about the visit. The social worker noted father expressed his excitement and enjoyment at being able to see Serenity. Father also told the social worker that if the court granted him custody, he would move back home to Chicago, where he would have housing and the support of his family to care for his daughter. He also confirmed in-person visits at the department's Temecula office worked well for him.

In July 2018, the social worker completed two interviews with father. He said he was born in Chicago and lived in the Midwest most of his early life. He met mother in Texas in February 2016. They moved together to California in May 2016 and married in August 2016. He said Serenity was born in November 2016. He was present for her birth and he was listed as the father on her birth certificate. After her birth, he and mother began experiencing problems with housing, and lived in hotels and a car. In early 2017, they got into an argument and mother punched him in the face. Mother left with Serenity against his wishes. He tried to locate housing but continued staying in hotels. He said mother and Serenity came back to stay with him for a week, but they moved out again when she found a roommate.

Eventually, father got back into contact with mother and asked her why she had run off with Serenity. Mother said she "needed space." Father found her to be very emotional, "stressing out and having suicide ideations." Because of their inability to establish housing, father had a plan to move back to his home state. He reported he had Serenity for four days in March 2017, but then returned her to mother. The following day she started telling him she was "stressed out and . . . did not 'want to do this anymore' and if a solution was not established she was going to give [Serenity] to the state." Later, father got a new job and a place to stay at a friend's home in Perris, and they agreed Serenity would move in with him, while mother remained in Riverside. However, those plans fell through because he didn't have childcare for the times he was working.

Father denied leaving Serenity without support. He reported he had been paying child support to mother since February 2018. He said, "When [mother] left me and 'went wherever she went,' I was working a temporary job leading up to getting hired full-time, I was sending her money prior to getting placed on child support. I was supporting her by providing her with $80-$90 on top of her receiving government assistance." He said he attempted to see Serenity, but mother would threaten him and hang up. At some point, mother told him the child wasn't his, so he took a paternity test as part of the child support case, which showed he was her biological father.

Father told the social worker he wanted Serenity placed with him. "I would prefer Serenity to be with me 'Even if me and [mother] aren't talking, I still would be willing to work and be open to compromising and developing a plan.' I do not want Serenity to not

know who her mother is but if it came down to one last thing, I would want her to be with me."

The social worker informed father of the statutory six-month limitation on reunification for children as young as Serenity. She told him he could relinquish his daughter for adoption, but he responded, "I'm going to say no to that. It's not like Serenity does not have any place to go. I have family back home and since moving to California, it has become hard for a single person to do this by themselves. However, if an adoption has to happen, I would like my family to adopt her and not a complete stranger." He said he would be willing to participate in parenting classes because Serenity is his first child, as well as any services the department recommended. He indicated to the social worker that he would need housing assistance to provide for his daughter.

The department included a recommended case plan for father. His objectives were to "obtain and maintain a stable and suitable residence" and "acquire adequate resources to meet her needs." The case plan listed his responsibilities as participating in an approved parenting education program and "individual counseling to address issues relating to past relationship issues and/or trauma which may have an impact on his life." The department did not make any provision for helping father obtain aid in finding and paying for a residence.

Also in July, father visited Serenity in person. The visit went well. The foster parent reported Serenity was shy about interacting with father, but said father was patient with her and understood she wasn't sure who he was. During this period, mother

informed the social worker that she no longer wanted to fight and would choose not to participate in reunifying with Serenity.

C. *Jurisdictional and Dispositional Hearing*

Based on these developments, the department filed an amended petition containing amended recommendations for how to handle Serenity's case. They struck the allegations that father's whereabouts were unknown and that he'd failed to provide Serenity with adequate food, clothing, shelter, and medical treatment. After the changes, the petition contained no allegations regarding father. The department recommended the trial court find the allegations against mother true by a preponderance of the evidence, and that Serenity be adjudged a dependent of the court.

Despite the absence of allegations, the department made recommendations regarding father's status. First, they recommended the court remove Serenity from the physical custody of both parents. Second, they recommended the trial court find by clear and convincing evidence as to both mother and father that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home." (§ 361, subd. (c)(1).) Third, they recommended the trial court find by clear and convincing evidence that for father "there would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the child for the [noncustodial] parent . . . to live with the child or otherwise exercise . . . [his] right to physical custody." (§ 361, subd. (d).) The department also indicated they were required to provide reunification services to mother

10

and father. In their report, the department recommended the court find father is the presumed father, though they neglected to include that recommendation in their amended petition or their amended recommended findings and orders form which was attached to the amended petition, and which juvenile courts have a practice of relying on to make their findings if they agree with the department's position.

The trial court held a contested jurisdiction and disposition hearing on July 18, 2018. Neither parent was present, though both were represented by counsel. The trial court took the department's reports into evidence. Father's counsel informed the court he had talked with father several times, and father was trying to get reliable transportation. Father's counsel emphasized there were no allegations against father in the first amended petition. He represented that father had had some contact with Serenity and asked for authorization to increase contact to include overnight and weekend visits and, ultimately, placement with father.

The trial court followed the department's recommendations and recommended findings. It found true, by a preponderance of the evidence, the allegations in the first amended petition. It found Serenity to be a dependent of the court and that the department had made reasonable efforts to prevent removal. It found by clear and convincing evidence it would be detrimental to Serenity to return her to her home, and ordered the child removed from the custody of both parents. As to father in his role as a noncustodial parent, the court found by clear and convincing evidence that it would be detrimental to Serenity to place her in his custody.

11

The court ordered family reunification services for both parents, and father's case plan included a parenting class and individual counseling. The court ordered supervised visits for father and gave the department discretion to allow unsupervised visitation. Father's counsel reiterated to the court that the allegations against his client had been stricken and he was a nonoffending parent, and requested unsupervised visits, overnight weekend visits, and placement. The court decided to maintain supervised visits because, "I don't think he was in the child's life. And [to] make sure that he's doing well," but did give the department authority to approve unsupervised overnight visits and placement. The court didn't expressly address the recommendation in the department's report to find father had the status of presumed father.

D. *Six-month Review Hearing and Termination of Reunification Services*

By January 2019, the social worker reported father hadn't engaged in a parenting class or individual therapy. He was living with a friend in Hemet and working at a warehouse in Temecula. The social worker performed a background check and found father had no warrants and no arrests or convictions.

Father told the social worker he was aware of his goals and that he needed to find stable housing to have custody of Serenity. He said he wants to reunify with her but didn't understand why he had to complete services in order to do so. Mother was not participating in her case plan components.

The social worker reported father's visits with Serenity were sporadic. Initially, visits were limited to video calls. He had participated in only one in-person visit with the

child. He arrived late for the visit and Serenity was distressed when he attempted to get close. However, her caregiver reported father was very patient and kind to the child and tried to play with her.

The social worker concluded the prognosis of returning Serenity to her parents' custody was not good. "The parents have not dealt with the issues that brought their family to the attention of Child Protective Services. . . . The father has not completed any of his case plan services and is currently homeless. He has no stability and or provisions to adequately provide for the child. The Department cannot safely return the child to the care of either parent as the child would be at risk for continued abuse and or neglect." Consequently, the department recommended the court terminate the parents' services and schedule a section 366.26 hearing to determine a permanent plan for Serenity.

On February 26, 2019, the trial court held a contested six-month review hearing. Neither parent was present. Father's counsel informed the court father was working full-time in Temecula at a warehouse and he did not have a car, so his only way to get to court was to take a long bus ride. He reminded the court that father was a nonoffending parent, and he had contacted the entity "A Loving Way" to begin parenting and individual counseling. He reported father had visited Serenity the week prior, and requested the court extend his services for six months. Mother's counsel reported that mother agreed her services should be terminated.

The court found the department had provided the parents with reasonable services, but they had made no progress toward alleviating the causes of the removal. The court found by a preponderance of the evidence that returning Serenity to father's care would create a substantial risk of detriment to her well-being.

The court terminated both parents' reunification services and scheduled a section 366.26 hearing for June 26, 2019 to determine a permanent plan for the minor. The court reduced father's visits to one time a month for father and refused father's counsel's request for visits twice a month.

The court didn't mention the requirement that father seek an extraordinary writ to preserve his right to appeal the order terminating services and setting the section 366.26 hearing, nor did it mention that father would have to file a notice of intent to file a writ petition within seven days. The court merely directed the clerk "to provide written notice as set forth in the California Rules of Court." However, the written notice sent to father a month later, on March 25, 2019, doesn't mention that he would have to seek an extraordinary writ to preserve his appeal.

E. *Father's 388 Petition and Termination of Parental Rights*

In June 2019, father filed a section 388 petition seeking to change the court's February 2019 order terminating his family reunification services. Father sought a new order for services, as a nonoffending parent, based on the fact he was engaged in therapy, as required by his reunification plan. He attached a letter from his therapist confirming his participation in individual therapy over the previous two months and offering to

14

provide parenting education classes to him as well. He said he had difficulty visiting Serenity in the beginning of the case because of problems with transportation and money.

The court scheduled a section 388 hearing to coincide with the upcoming section 366.26 hearing, which ultimately occurred in January 2020. In the time leading up to the hearing, the social worker noted father continued to participate in video conferencing visits with Serenity and had some in-person visits, but only on a sporadic basis. Father had trouble scheduling and keeping appointments, which he blamed on his work schedule and lack of transportation. Serenity often seemed uncomfortable around father.

Father had continued participating in therapy, which contained a parenting component, and he was scheduled to complete therapy in November 2019. His therapist reported he was motivated to begin parenting his daughter and was an active participant in his therapy sessions.

Father came to the hearing in January 2020, but mother didn't. Father and the social worker testified.

1. *The social worker's testimony*

Father's counsel called the social worker as a witness. She said she had been on the case since May 2018. She acknowledged there were no allegations in the petition against father.

She said father had been living in the Temecula area throughout the case and reported he had obtained a new job at a hospital. She didn't talk with his therapist to confirm his participation in therapy because the therapist didn't have the necessary

15

medical release paperwork. She was told there was already a release on file with the department but didn't contact father's attorney to obtain a release.

She acknowledged father had told her about his difficulties making visits and asked her to make them more convenient. She tried to do so by monitoring visits at the Lake Elsinore office in August and September 2019. She said father has also participated in video chats with Serenity, and the caregiver told her what happened on these chats. She said father had not engaged in any improper activity during his visits, but that he simply played with the child and didn't express affection for her.

The social worker acknowledged her relationship with father was strained. She said she didn't think the court should grant his section 388 motion because his situation was the same as when the department became involved in the case.

### 2. *Father's Testimony*

Father said he had recently moved into a new apartment with his cousin's family in Murrieta. He'd been there for two weeks and said it's a long-term residence. He said he had also started a new job working at a Temecula Valley Hospital where he had just completed orientation. He was a full-time employee with benefits that would start after he'd worked there for three months. He characterized the job as good, stable employment that paid more than his former warehouse job. The benefits included assistance with tuition and childcare and health insurance for himself and Serenity.

Though he had worked in his previous job at the warehouse for about a year, it was a temporary job. He also explained the warehouse job had created significant

obstacles for making weekday visits to Lake Elsinore. He worked there every weekday from early in the morning until 3:30 in the afternoon. Since public transportation from Temecula to Lake Elsinore took him an hour and a half, he was usually unable to make in-person visits. For a while, Serenity's caretaker arranged in-person visits with him in Murrieta on Saturdays. However, that arrangement was inconvenient for her and she asked him to start visiting in Lake Elsinore on weekdays again.

Father also said after the court terminated services, the department informed him he could no longer arrange visits with the caregiver, and he would have to arrange visits through the department to occur during work hours on weekdays. He said the social worker had not worked with him to find a way to make visits fit his schedule. He said with his new work schedule, he would be able to visit once a week if services resumed, and he was saving to buy a car. Father also said if he was granted additional services, he hoped the department could help him with housing, which is what he has been told is the reason he can't have custody of his daughter.

Father said it has always been his goal to have Serenity in his custody. It was his hope to return to Illinois with his daughter. He said he was upset when he found out Serenity was in protective custody. He had recently lost his home in part because he was paying child support and expenses.

He said he had completed about 13 to 15 weeks of counseling and parenting classes. He found the therapy and his parenting sessions helpful for learning to take care of a small child, and said he did activities and role-playing. He would be willing to do

17

additional therapy and parenting courses, if requested.

### 3. *The Court's Rulings*

After argument, the court denied father's petition to change the order terminating services. It concluded father's circumstances were, at best, in the process of changing and that ordering additional services wasn't in Serenity's best interest.

"Father throughout the duration of this case since it began in May of 2018 has not demonstrated that he's capable of providing a safe and stable home, along with the financial means to have Serenity in his care. [¶] Even if father may have completed his case plan, this Court believes the circumstances to be more in line with changing and not sufficient change in circumstances. The fact that the case plan services may be completed does not in and of itself demonstrate that the parent is ready [to] have the child placed in their care. [¶] I understand from what counsel is representing today, he's not asking for placement. He's really asking for services so it could potentially lead to placement. But this Court has to look at the entire case and the actions of father and where he's progressed from the beginning to now, and the Court doesn't believe that giving six more months of services is going to get father to a point of being able to have his daughter in his care and weighing that with keeping Serenity where she is with her caregiver. [¶] Even if I did consider the circumstances of father currently to be changed, I don't see that father has shown it's in the best interest of the minor child to grant him six more months of services with [the] possibility of return."

18

On termination of parental rights, father's counsel argued the parental child bond exception (§ 366.26 (c)(1)(B)(i)) applies and that the department was asking the court to terminate father's parental rights due to poverty, which is explicitly barred by statute. "[T]he Department has been a bar to visitation. They have been the obstacle to having consistent contact. Because of poverty, dad is having the situation right now where his parental rights can be terminated. So, we object to the recommendation."

The court rejected these arguments. It found there was clear and convincing evidence Serenity was adoptable and the parental child bond exception didn't apply. The court concluded, "A sufficient basis for termination of the parental rights exists based upon the findings made at the [Welfare and Institutions Code] section .21(e) hearing held February 26, 2019. And at that hearing, the Court found that reasonable services were provided or offered to the parents to overcome the problems which led to the initial removal of the child. Nevertheless, despite the availability of those services, the child could not be returned to the parents' custody, and there's no substantial probability of return within the next six months. [¶] Termination of parental rights would not be detrimental to the minor . . . and adoption is in the best interest of the child." The court terminated father's and mother's parental rights and ordered a permanent plan of adoption for Serenity.

Father filed a timely notice of appeal challenging both rulings.

# II

## ANALYSIS

A. *Forfeiture of Appellate Rights*

Father challenges the trial court's finding that returning Serenity to his custody would be detrimental to her, which undergirds the decision to terminate both services and parental rights. Before reaching the merits, we address the department's argument, first raised at oral argument, that father can't appeal the setting order, and therefore can't challenge the detriment finding, because he didn't preserve his right to appeal by seeking an extraordinary writ.[3] (§ 366.26, subd. (*l*)(1) ["An order by the court that a hearing pursuant to this section be held is not appealable at any time unless . . . [a] petition for extraordinary writ review was filed in a timely manner"].) As the department points out, ordinarily "[a] setting order is not appealable; direct appellate consideration of the propriety of the setting order may be had only by petition for extraordinary writ review of the order." (*In re Cathina W.* (1998) 68 Cal.App.4th 716, 719.)

However, the court must give the parent notice of the writ requirement and a failure to do so provides good cause for allowing the appeal. (*In re Cathina W.*, *supra*, 68 Cal.App.4th at p. 719.) The statute directs the trial court "shall advise all parties of the

---

[3] Ordinarily, we trust the parties to raise meritorious issues in their briefing, and don't address issues not raised until oral argument "because such consideration would deprive the [other party] of an opportunity to counter the argument." (*American Drug Stores, Inc. v. Stroh* (1992) 10 Cal.App.4th 1446, 1453.) We exercise our discretion to address their argument only because the principle is important, and we were easily able to confirm forfeiture doesn't apply.

requirement of filing a petition for extraordinary writ review as set forth in this subdivision in order to preserve any right to appeal in these issues." (§ 366.26, subd. (*l*)(3)(A); see also Cal. Rules of Court, rule 5.695(g)(10).) "The juvenile court must provide oral notice to all parties present at the setting hearing and notice by mail to all other parties that such a writ may be filed." (*In re Harmony B.* (2005) 125 Cal.App.4th 831, 838.) California Rules of Court, rule 5.695(g)(10)(A) specifies the court must provide written notice *within 24 hours* of the hearing. "When notice is not given, the parents' claims of error occurring at the setting hearing may be addressed on review from the disposition following the section 366.26 hearing." (*In re Harmony B.*, at p. 838; see also *In re Cathina W.*, *supra*, 68 Cal.App.4th at pp. 722-726; *In re Rashad B.* (1999) 76 Cal.App.4th 442, 450 ["Since appellant was not given notice of her right to file a writ petition, and since that failure of notice is ultimately attributable to an error of the court, appellant's claims of error are cognizable on appeal even though they would serve to undermine the referral order"].)

The trial court did not affect notice of the writ requirement in this case. It made no mention of the requirement at the February 26, 2019 hearing where it terminated reunification services and set the 366.26 hearing. And though it directed the clerk of court "to provide written notice as set forth in the California Rules of Court," the only notice in the record advised father that a section 366.26 hearing had been set but omits any mention of the requirement of seeking an extraordinary writ to preserve his appeal rights. The written notice also came too late; it was sent one month after the hearing, not one

day. (Cal. Rules of Court, rule 5.695(g)(10)(A) ["Within 24 hours of the hearing, notice by first-class mail or by electronic service in accordance with section 212.5 must be provided by the clerk of the court to the last known address of any party who is not present when the court orders the hearing under section 366.26"].)

Only a minute order says anything about the writ requirement, representing "the court advised all parties present in court" of the need to file a writ to preserve appellate rights. The transcript shows that advisement didn't happen, and in such a conflict the transcript controls. (*People v. Zackery* (2007) 147 Cal.App.4th 380, 385-386.) Where a "minute order contains a recital that '[t]he parties are advised of writ procedures in open court,' [but] the reporter's transcript establishes the juvenile court failed to orally advise mother of her writ rights . . . we presume the reporter's transcript is the more accurate." (*Jennifer T. v. Superior Court* (2007) 159 Cal.App4th 254, 259.) In any event, father wasn't present at the hearing, so written notice was required.

We therefore conclude father may seek review of the court's detriment finding on appeal of the order terminating his parental rights.[4] We recognize allowing the late challenge cuts against the strong interest in establishing Serenity in her final placement as

---

[4] Some courts have declined to allow appeal of a setting order, but instead convert the purported appeal into an ordinary writ of mandate, relieving the parent of the normally shortened period for seeking an extraordinary writ. (E.g., *Jennifer T. v. Superior Court*, *supra*, 159 Cal.App.4th at p. 260.) Those cases involve attempts to appeal directly from the setting order, not attempts to challenge findings supporting the setting order on an appeal of a termination order. (*Ibid.*) In any event, both lines of cases, including our own precedent, establish failure to advise a parent of the writ requirement provides good cause to bring a late challenge to findings that form the basis of a setting order. (*In re Harmony B.*, *supra*, 125 Cal.App.4th at p. 838.)

quickly as possible. However, the "rule is a necessary evil required to protect fundamental due process despite its detrimental impact on the goals of expedition, finality and stability." (*In re X.Z.* (2013) 221 Cal.App.4th 1243, 1251.)

B. *Clear and Convincing Evidence Standard*

Father argues the trial court violated his due process rights by terminating his parental rights without first finding, under the clear and convincing evidence standard, that giving him custody would be detrimental to Serenity.

Father is without question correct that parental rights are fundamental and a trial court "may not terminate a nonoffending, noncustodial mother's or presumed father's parental rights without finding, by clear and convincing evidence, that awarding custody to the parent would be detrimental." (*In re D.H.* (2017) 14 Cal.App.5th 719, 730.)

This is an application of the longstanding protections we afford parents, based on the recognition of their fundamental interest in the companionship, care, custody, and management of their children. (*In re B.G.* (1974) 11 Cal.3d 679, 688.) "'Before a State may sever completely and irrevocably the rights of parents in their natural child, due process requires that the State support its allegations by at least clear and convincing evidence.' [Citation.] 'After the State has established parental unfitness at that initial proceeding, the court may assume at the *dispositional* stage that the interests of the child and the natural parents do diverge.' [Citation.] 'But until the State proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their natural relationship.'" (*In re Gladys L.* (2006) 141 Cal.App.4th 845,

23

848.)

The detriment finding may occur earlier in the proceedings than the section 366.26 hearing. "California's dependency system comports with [the due process] requirements because, by the time parental rights are terminated at a section 366.26 hearing, the juvenile court *must* have made prior findings that the parent was unfit. [Citation.] 'The number and quality of the judicial findings that are necessary preconditions to termination convey very powerfully to the fact finder the subjective certainty about parental unfitness and detriment required before the court may even consider ending the relationship between natural parent and child.' [Citation.] The linchpin to the constitutionality of the section 366.26 hearing is that prior determinations ensure 'the evidence of detriment is already so clear and convincing that more cannot be required without prejudice to the interests of the adoptable child, with which the state must align itself.'" (*In re Gladys L.*, *supra*, 141 Cal.App.4th at p. 848.) California's dependency scheme no longer uses the term "parental unfitness," but instead requires the juvenile court make a finding that awarding custody of a dependent child to a parent would be detrimental to the child. (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 224, fn. 3.)

The problem with father's argument is his premise that the trial court failed to make a detriment finding under the heightened clear and convincing evidence standard. In fact, in keeping with the principles set out above, the court made an explicit detriment finding at the disposition hearing under the new section 361, subdivision (d), which relates specifically to noncustodial parents and provides that "[a] dependent child shall

not be taken from the physical custody of his or her parent[] . . . with whom the child did not reside at the time the petition was initiated, unless the juvenile court finds *clear and convincing evidence* that there would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the child for the parent [or] guardian . . . to live with the child or otherwise exercise the parent's . . . right to physical custody, and there are no reasonable means by which the child's physical and emotional health can be protected without removing the child from the child's parent's . . . physical custody." (§ 361, subd. (d), italics added.) Before the jurisdiction and disposition hearing, after father had contacted the department and interviewed with the social worker, the department recommended that the trial court find by clear and convincing evidence that placing Serenity in father's custody would be detrimental to her well-being under this provision. At the contested July 2018 jurisdiction and disposition hearing, the trial court made the required finding under that provision. To the extent father's argument relies on the premise that the court made no such finding, his argument is unsound.

C. *Support for the Detriment Finding*

The real problem with the trial court's detriment finding is it was based on father's poverty, which is barred by statute and our case law. The dependency statute directs "[a] child shall not be found to be a person [subject to dependency proceedings] solely due to the lack of an emergency shelter for the family." (§ 300, subd. (b).) It follows that "poverty alone, even abject poverty resulting in homelessness, is not a valid basis for assertion of juvenile court jurisdiction. . . . Put differently, indigency, by itself, does not

25

make one an unfit parent and 'judges [and] social workers . . . have an obligation to guard against the influence of class and life style biases.'" (*In re G.S.R.* (2008) 159 Cal.App.4th 1202, 1212 (*G.S.R.*).)

We recognize this rule because the overriding interest of the dependency laws is to maintain and support the family unit. (*Hansen v. Department of Social Services* (1987) 193 Cal.App.3d 283, 293-294 ["a regulation that requires the removal of a child from his or her family in order to interpose social services with the ostensible purpose of providing shelter for such child, contradicts and subverts the primary purpose of our child welfare laws"].) Thus, where family bonds are strained by the incidents of poverty, the department must take steps to assist the family, not simply remove the child and leave the parent on their own to resolve their condition and recover their children. That approach is consistent with "the purpose of the Juvenile Court Act that the bond between a minor and [their] family be 'preserved and strengthened' (§ 202) through the provision of appropriate services. [Citation.] 'The legislative scheme contemplates immediate and intensive support services to reunify a family where a dependency disposition removes a child from parental custody.'" (*Hansen*, at pp. 292-293, quoting *In re John B.* (1984) 159 Cal.App.3d 268, 274.)

To that end, California courts have repeatedly found social services must actively seek to assist a parent suffering from poverty in obtaining adequate housing and that trial courts may not terminate reunification services or parental rights if they have failed to do so. (*T.J. v. Superior Court* (2018) 21 Cal.App.5th 1229, 1247-1248 [reversing

26

termination of reunification services where social services merely referred mother to a housing assistance program which put her on a wait list]; *In re P.C.* (2008) 165 Cal.App.4th 98, 106 [reversing termination of parental rights based on inadequate housing where social services "simply recommended mother look in the Pennysaver for housing, and admittedly was unaware of other resources to which she could refer mother for low-income housing"]; *In re T.W.-1* (2017) 9 Cal.App.5th 339, 347 [concluding reunification services were inadequate where "the case plan failed to include any housing services, despite the juvenile court's direction that such services be included"]; *G.S.R.*, *supra*, 159 Cal.App.4th at pp. 1213-1214 [reversing termination of parental rights based on father's lack of housing when social services failed to provide housing assistance].)

We find *G.S.R.* too analogous to ignore. There, the trial court removed two children from their mother's custody after she was arrested for having sex with a minor. (*G.S.R.*, *supra*, 159 Cal.App.4th at p. 1205.) At the time, social workers couldn't locate father, so the trial court placed the children with their paternal grandmother and uncle. (*Ibid.*) The father appeared two months later and thereafter remained involved in his children's lives. However, he wasn't able to assume custody because he couldn't provide the children with suitable housing and wasn't employed full-time. (*Id.* at p. 1206.) He also admitted to prior alcohol and drug use but said he'd stopped using any drugs more than a decade earlier and had stopped drinking a year ago. (*Ibid.*) The trial court ordered the father to participate in a sobriety program anyway and awarded him unmonitored visitation with the children at the grandmother's home. (*Id.* at p. 1207.) At subsequent

27

hearings, including the permanency planning hearing, the trial court found placement with father would be detrimental to the children because he didn't have stable housing and had skipped some sobriety program meetings. The court made that finding despite the fact that father was a nonoffending, noncustodial parent, who had provided support and remained in contact with the children. (*Id.* at pp. 1211, 1213.) The court determined the children were likely to be adopted and terminated his parental rights.

The Court of Appeal concluded the trial court had failed to apply the clear and convincing evidence standard when it made its detriment finding, but also concluded the record didn't support such a finding in any event. (*G.S.R.*, *supra*, 159 Cal.App.4th at pp. 1210-1212.) The appellate court refused to rely on the father's lack of housing as supporting the detriment finding. "As for the finding of detriment based on [father's] lack of housing, that finding arises directly out of the fact of his poverty. The record is devoid of evidence that, but for his inability to obtain housing, [the father] is incapable of adequately parenting his sons." (*Id.* at p. 1214.) The court noted lack of housing can't serve as a legitimate ground for removing a child from parental custody, and rejected the suggestion that social services could "bootstrap the fact that [the father] was too poor to afford housing . . . to support findings of detriment, all of which flow directly from the circumstances of [father's] poverty." (*Id.* at p. 1213.) The court emphasized social services had compounded the problem by utterly failing to assist the father in locating suitable housing. (*Id.* at pp. 1214-1215.) The court also rejected the trial court's reliance on the fact the father had missed some sobriety treatment sessions because "there was

28

never any showing his failure to [attend] posed any risk to his sons. While [the department] may desire it from an abundance of caution, participation in [sobriety] or another rehabilitation program should not be a prerequisite for a parent who has shown no problem maintaining sobriety." (*Id.* at p. 1214.)

The facts of this case are remarkably similar. Father's absence from the home and failure to support the child were the department's initial bases for removing Serenity from him. But those allegations proved unfounded once he made contact with the department. He said he was married to mother and present for Serenity's birth, lived with them for about four or five months before mother left with the child, and tried to reunite but had trouble with childcare due to irregular housing and the demands of his temporary job. He also said he'd had a paternity test and paid child support under a family court order. In the face of this new information, the department rightly amended the petition to remove the only allegations against him—that he had failed to provide support. Thus, just like the father in *G.S.R.*, Serenity's father was a nonoffending, noncustodial parent, who had been absent when the case began, but quickly turned up and expressed strong interest in regaining custody.[5]

---

[5] The department argues father is not entitled to due process protections because the trial court never formally found him to be a presumed father. We disagree. After father contacted the department, he confirmed he is Serenity's biological father and said he was married to mother, present at Serenity's birth, appears on her birth certificate, took a paternity test to confirm he's the biological father, and paid child support, both on his own and under a family court order. The department rightly conceded he is a presumed father in its submission to the trial court and requested that the trial court make that finding. However, the department didn't include the request in its formal recommended findings, and the court neglected to include it in its order, but proceeded as

*[footnote continued on next page]*

Also like the father in *G.S.R.*, father couldn't regain custody of Serenity because of his economic situation, not his parenting ability. He lacked adequate housing and also lacked transportation. Those are the reasons he initially declined to take custody, though he always indicated his intention to address those circumstances. The department's case plan for him, which the court adopted, said his objectives were to "obtain and maintain a stable and suitable residence" and "acquire adequate resources to meet her needs." Father did make progress on obtaining housing, but not quickly enough. He held down a regular job for about a year, though it was a low-paying, temporary job with little flexibility. As a result, he wasn't able to get permanent housing until months after the trial court had terminated his reunification services. We agree with the court in *G.S.R.* that these housing problems do not support the trial court's detriment finding as a basis for terminating father's parental rights.

Meanwhile, again as in *G.S.R.*, the department did nothing to help father resolve the real barriers to custody. Father himself identified housing as a barrier to his taking custody of Serenity and repeatedly requested help from the social worker. The case plan itself rightly identifies obtaining a stable residence and adequate resources to take care of Serenity as objectives he should pursue to regain custody. Yet the department did nothing to help him achieve those goals. Their negligence compounded father's problems, as did their insistence that he expend time and resources attending individual counseling

if it had, ordering reunification services, appointing counsel, and taking up father's rights. We note the notice of the section 366.26 hearing identifies father as the presumed father.

sessions and parent classes, which the department recommended and the court imposed even *before father had contacted the department*. Under these circumstances, father's problems with housing cannot support the court's detriment finding. (*G.S.R.*, *supra*, 159 Cal.App.4th at pp. 1213-1214.)

The department points to father's problems with maintaining a regular visitation schedule as an important difference between this case and *G.S.R.* They argue the fact he managed only six in-person visits with Serenity and the indications she was not bonding with him supports the detriment finding. We disagree. Father's problems with visitation recapitulate his problems with housing. There's no evidence he failed to make visits out of a lack of commitment to Serenity. Instead, the record shows he missed visits because the department had placed Serenity in a foster home far from where he worked and lived. Father lived and worked in Temecula, Perris, and Hemet, while Serenity lived in Corona. As he explained in his testimony, the distance severely limited his ability to attend regular visits with his daughter, which in turn harmed his ability to build a relationship with her. Taking the bus, it took him an hour and a half to travel to see Serenity. Given his work schedule, that made it next to impossible to visit her on weekdays, which the department preferred. Father expressed a preference for visits at the department's Temecula office. For a while, Serenity's caregiver agreed to meet him in Murrieta and on the weekends, but that arrangement eventually broke down. And after the trial court terminated reunification services in February 2019, the department told father he would have to travel to Lake Elsinore to see Serenity and would have to make visits work during

31

regular working hours on weekdays. Father said the social worker hadn't worked with him to make visits fit his schedule. Father was, unsurprisingly, unable to make that work on a regular basis.

It's true the father in *G.S.R.* had more successful and more regular visits with his children. However, his situation was comparatively easy. His children were 6 and 8 years old at the beginning of the case—old enough that they already had a relationship with him—and their grandmother was local and able to take custody. That made visiting the children and maintaining a relationship easy. In this case, father was similarly adamant about regaining custody, but Serenity was an infant, mother had taken her away when she was only four or five months old, and he didn't have local family support. At that point, mother was still attempting to reunite with Serenity. Since mother resided in Riverside, the department placed the child in foster care near her, which turned out to be a prohibitive distance from him. Though he repeatedly told the social worker he was having trouble with transportation and consistently sought to supplement in-person visits with online video visits, the department did nothing to provide real assistance. We can all appreciate now, in the midst of the COVID-19 quarantine, that video meetings are not an adequate substitute for meeting in person, even for adults. That's even more true for children, especially small children, who aren't cognitively developed enough to engage in that setting. The department stood by and allowed father's reunification efforts to fail due to his lack of economic resources. Like the court in *G.S.R.*, we conclude he must be given a real opportunity to reunite with Serenity before his parental rights are terminated.

The department attempts to salvage the termination order by pointing out he failed to fulfill his obligation to complete individual counseling and parent training, two elements of his reunification plan. This argument raises another similarity between the father in this case and the father in *G.S.R.* The department and trial court included in the reunification plans of both men certain prophylactic treatment requirements that had little or no connection with the barriers they faced to gaining custody. In both cases, it was mother's conduct that brought the children into the dependency system, and neither father faced any allegations in the dependency petition. In both cases, if the fathers had stable housing, it's likely the children would have been placed with them. But in both cases, the department and court took the opportunity to require them to attend counseling that *might* give them a better chance of succeeding as parents in the event they did gain custody. In *G.S.R.*, the court required father to attend sobriety counseling meetings, even though there was no evidence he still drank or that drinking affected his parenting. Here, the court required father to attend individual counseling and a parenting class. Father agreed to both, and when he did attend them, belatedly, he admitted they were helpful. But there was no suggestion that either form of counseling had any bearing on the reasons he couldn't have custody of Serenity, nor was there evidence they were required to address any problem with his parenting. Indeed, as we mentioned above, the department recommended these services and the court ordered them, before he had returned to the scene. Though he readily agreed to participate in parenting classes and any other services the department recommended, he rightly emphasized to the social worker that what he

really needed was housing assistance to provide for the child. For these reasons, we reject the department's argument that father's initial failure to attend these counseling sessions supports the detriment finding. (See *In re M.R.* (2020) 48 Cal.App.5th 412, 424 [juvenile court "cannot arbitrarily order services that are 'not reasonably designed' to eliminate the behavior or circumstances that led to the court taking jurisdiction of the child"]; *In re Drake M.* (2012) 211 Cal.App.4th 754, 770 ["The imposition of parenting courses cannot be 'based on a rote assumption that [father] could not be an effective single parent without parenting classes"].)

We recognize there's no completely satisfactory remedy for this situation. The department's failure to engage with father's core problem—his poverty—and its focus on peripheral issues have deprived him and his daughter of years during which they could have established a loving relationship. As a result, Serenity has been placed in a prospective adoptive home that is presumably loving and at least stable. We wish there were a way of addressing the problem that would not create even more turmoil and uncertainty than she already has experienced. Obviously, it would have been better for Serenity and father had the trial court and the department been more diligent from the outset. It's unfortunate that we have to reset the clock now, but we can't permit termination of father's parental rights on the basis of his economic status when the department failed to provide adequate assistance.

We conclude *G.S.R.* provides an imperfect, but appropriate framework for addressing the circumstances of Serenity and her father on remand. The *G.S.R.* court

determined the father's "due process rights were denied by [the department's] failure to demonstrate sufficient detriment and the juvenile court's failure to find a legitimate basis for deeming him unfit." Recognizing the difficulty of repairing the problem at such a late stage, the court reversed the termination and remanded "with instructions that the trial court revisit the issue of whether, based on facts and circumstances as they exist *at this time*, there exist legally sufficient grounds to find it would be detrimental to return the [children] to [the father], recognizing poverty is not such a ground. If not . . . the juvenile court shall restart the clock on reunification services and related efforts, including housing assistance, to afford [the father] a legitimate opportunity to build a relationship with and become a full-time parent to his [children]. Only in the event those renewed efforts fail may the juvenile court proceed with termination of parental rights. If the trial court determines it would not be detrimental to return the [children] to [his] care, it shall take the necessary steps to assist [their] return to [his] custody." (*G.S.R.*, *supra*, 159 Cal.App.4th at pp. 1215-1216.)

D. *Changed Circumstances*

Our conclusion makes it unnecessary to review the trial court's order denying father's section 388 petition. We note, however, that the ability of parents to show their circumstances have changed is critical to ensuring parents receive due process. "[S]ection 388 plays a vital role in preserving due process in dependency proceedings overall" because "it is only when read in conjunction with the "'escape mechanism'" section 388 procedures create that the limited options available at a selection and implementation

35

hearing under section 366.26 comply with due process. [Citation.] Thus, that section 388 provides such an "'"escape mechanism"'" *in practice*, not just in theory, 'is vital to the constitutionality of our dependency scheme as a whole, and the termination statute, section 366.26, in particular.'" (*In re J.M..* (2020) 50 Cal.App.5th 833, 847; see also *In re Marilyn H.* (1993) 5 Cal.4th 295, 309.)

We are not convinced the trial court was correct in finding father hadn't established changed circumstances in this case. Although the developments were recent, he testified he had finally obtained a permanent full-time job at higher pay as well as health care and childcare assistance that would benefit Serenity. He also testified he had nearly completed individual counseling and parent education. While these developments were new, the court's determination that father had established only that his circumstances were "changing, not changed," was too cavalier given the important role section 388 petitions play in the constitutionality of California's dependency scheme. In any event, on remand, the trial court must determine father's *current* circumstances, so his circumstances in January 2020 will no longer be relevant, and father will be able to inform the court whether he's been able to maintain his new housing and employment and obtain transportation.

## III

## DISPOSITION

We reverse the order terminating father's parental rights and remand the case to the trial court with directions to conduct a hearing to address whether legally sufficient current grounds—independent of his poverty and lack of stable, suitable housing and transportation—would make it detrimental to place the child in his care. If no such grounds exist, the juvenile court shall order the department to restart reunification services and related efforts, including, but not limited to, assistance in obtaining stable, suitable housing and transportation, and take the necessary steps to return the child to father's custody. The trial court shall order the department to provide reunification services for a period of six months. If these renewed efforts fail, the trial court may proceed to terminate father's parental rights. If grounds independent of his poverty and lack of stable, suitable housing and transportation currently exist making it detrimental to place the child in his care, the court shall reinstate its order terminating father's parental rights.

CERTIFIED FOR PUBLICATION

SLOUGH _____
J.

We concur:


MILLER _____
Acting P. J.


RAPHAEL _____
J.